**UNITED STATES of America**

v.

**Roger David HANDLEY, et al.**

**No. CR 84–AR–104–NE.**

United States District Court, N.D. Alabama.

July 14, 1986.

On Renewed Motion to Suppress Sept. 8, 1986.

Frank W. Donaldson, U.S. Atty., Bill L. Barnett, Asst. U.S. Atty., Craig Shaffer and Barbara Kammerman, U.S. Dept. of Justice, and Ann C. Robertson, Sp. Asst. U.S. Atty., Birmingham, Ala., for U.S.

Robert P. Bynon, Jr., Thomas J. Spina, Birmingham, Ala., for defendant Tucker.

John W. Sudderth, Birmingham, Ala., for defendant Handley.

## MEMORANDUM OPINION

ACKER, District Judge.

The nine defendants in the above entitled cause have separately presented the following motions:

(1.) Renewed motion to suppress each civil deposition in CV 80–HM–1449–S taken of a defendant in this case, based on allegedly newly discovered evidence showing that the sole purpose of the civil action was to obtain evidence for the criminal case. The motions by defendants Mason and White are first-time motions.

(2.) Motion to suppress each civil deposition in CV 80–HM–1449–S, based on the allegation that each said deposition was not voluntary but rather coerced.

(3.) Motion for dismissal of the indictment based on an alleged grant of immunity, express or implied.

(4.) Motion for a dismissal of the indictment on the basis of alleged preindictment delay.

(5.) Motion for dismissal of the indictment, or certain of its counts, on the basis of an allegation that the parade staged by the Southern Christian Leadership Conference (the subject of the indictment) was not "provided" or "administered" by the City of Decatur and was not a "public activity" as required by the criminal statute invoked by the grand jury.

(6.) Motion for a continuance pending final adjudication of CV 80–HM–1449–S.

(7.) Motion for a severance.

### (1.) The Renewed Motion To Suppress

In support of their renewed motions to suppress defendants have now introduced evidence which was not available prior to the suppression order entered on July 27, 1984, *United States v. Handley*, 591 F.Supp. 1257 (N.D.Ala.1984), and the subject of the opinion of the Eleventh Circuit in *United States v. Handley*, 763 F.2d 1401 (11th Cir.1985). Defendants attempt to hang their hats on the following expression by the Eleventh Circuit:

If such [the criminal indictment] is the *sole* purpose of the civil proceedings, then perhaps the Center's actions could be imputed to the government and the fifth amendment proscription of governmental compulsion would apply. [citations omitted]. The civil complaint, however, seeks legal and equitable relief on behalf of the plaintiffs as well as the referral of evidence to the government. Mr. Dees testified on deposition to the

continuing vitality of the civil suit and his clients' intention to pursue their claims despite the indictments. This testimony was undisputed. We therefore conclude that the civil case was not filed solely to obtain evidence for the criminal prosecution and is viable wholly apart from any criminal connotations. Any compulsion exerted by Mr. Dees and the Center against the civil deponents therefore may not be imputed to the government.

*Id.* at 1405–06 (emphasis in original).

Not only has this court now received new items into evidence in support of defendants' renewed motions but the court takes judicial notice of everything which has transpired in CV 80–HM–1449–S during the period intervening between the earlier suppression order and the present. Among these new facts is the fact that after one of the civil defendants in CV 80 HM–1449–S formally requested the termination of discovery and the setting of that case for trial (the complaint was originally filed on November 3, 1980), Mr. Dees, on June 12, 1985, responded, *inter alia,* as follows:

> Eight of the named defendants, many of them officials of the defendant Invisible Empire, Knights of the Ku Klux Klan, were indicted for violation of plaintiffs' civil rights and obstruction of justice in May, 1984. These indictments were partially the result of evidence uncovered by plaintiffs in the case *sub judice.* A ninth defendant has pled guilty to a federal information concerning similar charges.

> \*　\*　\*　\*　\*　\*

> The discovery should not be terminated and the case set for trial until the criminal proceedings now pending in the United States District Court for the Northern District of Alabama are terminated.

> \*　\*　\*　\*　\*　\*

> Plaintiffs believe that this litigation can be moved along much faster and with the least court involvement if discovery is not cut off or a trial date set until after the criminal trial is held.

In fact Mr. Dees has been successful in avoiding a trial of his civil case despite his and the Eleventh Circuit's description of it as "viable wholly apart from any criminal connotations". 763 F.2d at 1405–06. A second fact comes from an article published in *The Atlanta Constitution* on November 28, 1985, received into evidence without objection by the United States. There, Mr. Dees is quoted as follows:

> Civil cases usually take a back seat to criminal ones, Dees says. Everyone was prepared to put the civil case on hold while the criminal case went ahead.

A third indicator of Mr. Dee's "sole purpose" is the fact that even after the Eleventh Circuit pointed out to him that he had not served his summons and complaint in CV 80–HM–1449–S on Creekmore, he still has not done so, although Creekmore is obviously not hiding because he has regularly been present in this court. Does this demonstrate a serious purpose to seek civil relief from Creekmore?

While circumstantial, these new pieces of evidence, when added to the jigsaw, now convince this court, in the language of the Eleventh Circuit, that the *"sole purpose* of the civil proceedings" was to get information for the criminal prosecution, that is unless a collateral purpose was and is to get publicity for the Southern Poverty Law Center. If the civil case ever proceeds to trial, it will be because the undersigned judge has been the prod. It will not be the result of Mr. Dees' eagerness to wind up CV 80–HM–1449–S. Although the court has formed this belief in an exercise of its best judgment, the court finds that its conclusion in this regard cannot create a basis for circumventing or avoiding the Eleventh Circuit's holding which has become the "law of the case". The old Fifth Circuit succinctly states the binding principle here pertinent in *EEOC v. International Longshoremen's Ass'n.,* 623 F.2d 1054 (5th Cir. 1980), as follows:

> Under the "law of the case" rule, the trial and appellate courts are bound by any findings of fact or conclusions of law made by the appellate court in a prior appeal of the case at issue. *DeTenorio*

*v. Lightsey,* 589 F.2d 911, 917 (5th Cir.) *cert. denied,* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979).

*Id.* at 1058. The Eleventh Circuit found as a fact that Mr. Dees' "sole purpose" was *not* to obtain information for an indictment. Applying the "law of the case" doctrine, this factual question is closed. However, *International Longshoremen's* does recognize three exceptions to "the law of the case." The first is:

> (1) a subsequent trial produces *substantially different evidence.*

623 F.2d at 1058 (emphasis supplied).

The key words are "substantially different". This court's view of "substantially different" may vary from the view of the Eleventh Circuit, and this court is unwilling to employ the exception here. If, instead of interpreting Mr. Dees' civil pleadings and public statements and his inaction occurring after the earlier suppression order to indicate no purpose to pursue civil case, defendants could offer into evidence Mr. Dees' sworn confession that his sole intention has always been to obtain a criminal indictment, the court would be willing to apply the "substantially different evidence" exception. Defendants' evidence is pretty persuasive, but it is not substantial enough for this court to refuse to apply the "law of the case".

### (2.) Motion to Suppress Because of Involuntariness of Deposition.

The Eleventh Circuit did not expressly address the question of the voluntariness of any of the depositions taken in the civil case, or the effect on the admissibility of such a deposition in this case. It is possible, as argued by the United States, that the Court ruled on the question by implication in the last paragraph of its opinion which says:

> The government may introduce the depositions into evidence at trial pursuant to criminal rule 15(e) and the Federal Rules of Evidence, assuming satisfaction of confrontation concerns.

763 F.2d at 1406.

At the earlier suppression hearing this court never provided any of the civil depo-

nents, here defendants, an opportunity to testify personally about the impact which the civil order formally requiring them to submit to deposition and which informed them that they had no privilege, had, or may have had, on whether or not their respective depositions were "voluntary". Civil depositions were taken of defendants Handley, Mason, White, Steele, Riccio (twice), Tucker and Godfrey. Each defendant may have facts within his personal knowledge which would shed light on the voluntariness of his or another's deposition, and which might distinguish one deponent from the other deponents in this regard. A hypothetical example might be what Mr. Dees said to a particular deponent "off-the-record" prior to the deposition, or whether or not the deponent had advice of counsel, and if so, what advice the deponent received from such counsel, particularly with regard to the statute of limitations as applied to possible criminal charges. In the instant case the Government would necessarily be offering the civil depositions (except as an admission against the deponent himself) as hearsay exceptions under Federal Rule of Evidence 804(b)(1), which provides:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition *taken in compliance with law in the course of the same or another proceeding, . . . .*

Fed.R.Evid. 804(b)(1) (emphasis supplied). Neither this court nor the Eleventh Circuit has purported to rule upon the question of whether any civil deposition taken in the course of CV 80–HM–1449–S was taken "in compliance with law", namely, not in violation of the Fifth Amendment privilege against self-incrimination. Thus, the "law of the case" does not preclude further inquiry into the voluntariness of each civil deposition and whether or not the witness knowingly waived his Fifth Amendment rights when deposed. This analysis is entirely consistent with the following expression by the Eleventh Circuit in *United States v. Handley:*

A defendant has standing to object on the ground of the fifth amendment self-incrimination privilege to the admission only of his own statements.

763 F.2d at 1404.

The question of the admissibility of the deposition of a particular defendant in this case *over his own objection* is, then, still an open question.

If the court has misread the Eleventh Circuit's opinion in this regard, and the "law of the case", strictly applied, precludes all further inquiry into the "voluntariness" issue, this court again looks to *Longshoremen's* which recognizes the following two exceptions, in addition to the exception previously discussed:

(2) controlling authority has since made a contrary decision applicable to such issue, or

(3) the prior decision was clearly erroneous and would work manifest injustice.

623 F.2d at 1058.

*Handley* was decided by the Eleventh Circuit on June 25, 1985. It would certainly not be proper for this court to hold that the Eleventh Circuit's decision "was clearly erroneous and would work manifest injustice." But there is subsequent controlling authority which requires a careful look. *Erwin v. Price*, 778 F.2d 668 (11th Cir. 1985), was decided on December 16, 1985, several months after *Handley*. In *Erwin* the same Court holds:

The district court held that Erwin had no fifth amendment right to refuse to answer questions narrowly and specifically directed to his official duties and upheld his firing.

It is settled that the fifth amendment privilege against self-incrimination permits a person "not to answer official questions put to him in any other proceeding, *civil* or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). He may refuse "unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Id.* at 78, 94 S.Ct. at 322. A public employee may not be coerced into surrendering the privilege by threat of sanctions, *Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 97 S.Ct. 2132, 2135, 53 L.Ed.2d 1 (1977), and if he has been coerced into waiving the privilege, his answers are not admissible against him in a subsequent criminal trial. *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967). However, if he has not been required to waive this protection, but has refused to answer questions "specifically, directly, and narrowly relating to the performance of his official duties," the privilege would not be a bar to dismissal. *Gardner v. Broderick*, 392 U.S. 273, 278, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082 (1968).

We have held that the privilege against self-incrimination thus "affords a form of use immunity which, absent waiver, *automatically* attaches to compelled incriminating statements *as a matter of law.*" *Hester v. City of Milledgeville*, 777 F.2d 1492, 1496 (11th Cir.1985) (emphasis added). Plaintiff concedes that the questions at issue here were properly related to his duties and that he was assured that he was not being asked to waive his constitutional privilege. He contends, however, that he is entitled to a statutory grant of use immunity or a binding agreement from the district attorney not to use his statements in a criminal prosecution. He argues that without such a grant courts may ignore the many assurances given by his superiors and admit the statements. He also claims that he will unfairly have to bear the risk of persuading the court in a voluntariness hearing that by making his statement he did not waive his privilege. The logic of our holding in *Hester* leads us to hold that where there is a formal disciplinary investigation during which a public employee is ordered to answer proper questions under threat of dismissal, coercion is presumed and *the govern-*

ment bears the burden of demonstrating voluntariness. *See Hester v. City of Milledgeville*, 777 F.2d 1492, 1495–96 (11th Cir.1985). Therefore, "any grant of use immunity to the plaintiff[ ] would have been duplicative."

778 F.2d at 669–70 (emphasis in both original and supplied).

Then, after *Handley* and *Erwin* the Supreme Court decided *Crane v. Kentucky*, —— U.S. ——, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), on June 9, 1986. The Supreme Court there unanimously says:

It is by now well established that "certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. ——, —— [, 106 S.Ct. 445, 449, 88 L.Ed.2d 405] (1985). To assure that the fruits of such techniques are never used to secure a conviction, due process also requires "that a jury [not] hear a confession unless and *until the trial judge* [or some other independent decisionmaker] *has determined that it was freely and voluntarily given.*" *Sims v. Georgia*, 385 U.S. 538, 543–544[, 87 S.Ct. 639, 642–43, 17 L.Ed.2d 593] (1967). See generally *Jackson v. Denno*, 378 U.S. 368[, 84 S.Ct. 1774, 12 L.Ed.2d 908] (1964).

In laying down these rules the Court has never questioned that *"evidence surrounding the making of a confession bears on* its credibility" as well as *its voluntariness. Id.*, at 386, n. 13 [, 84 S.Ct. at 1786, n. 13.] As the court noted in *Jackson*, because "questions of credibility, whether of a witness or of a confession, are for the jury," the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's reliability during the course of the trial. *Ibid.* To the same effect was *Lego v. Twomey, supra*, [404 U.S. 477, 92 S.Ct.

619, 30 L.Ed.2d 618, 1972] where the Court stated,

"Nothing in *Jackson [v. Denno]* questioned the province or capacity of juries to assess the truthfulness of confessions. Nothing in that opinion took from the jury any evidence relating to the accuracy or weight of confessions admitted into evidence. A defendant has been as free since *Jackson* as he was before to familiarize a jury with circumstance that attend the taking of his confession, including facts bearing upon its weight and voluntariness." 404 U.S., at 485 [486] [, 92 S.Ct. at 625].

Thus, as *Lego* and *Jackson* make clear, to the extent the Court has addressed the question at all, it has expressly assumed that evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess.

The decisions in both *Jackson* and *Lego*, while not framed in the language of Constitutional command, reflect the common-sense understanding that the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual. *The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve.* See *Jackson v. Denno, supra*, [378 U.S.] at 378[, 84 S.Ct. at 1781.] But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. (emphasis supplied).

106 S.Ct. at 2145–46 (emphasis in original and supplied).

█ Because no trial judge and no appellate court has yet ruled upon the voluntariness of any of the civil depositions, and because both *Erwin* and *Crane* constitute "controlling authority" enunciated after

*Handley,* this court concludes that the "law of the case" does not preclude further inquiry into whether or not each of the depositions was freely and voluntarily given by the deponent. In this regard it is more than interesting that Mr. Dees, the lawyer who obtained and used a court order which denied any Fifth Amendment privilege to defendants and required them as civil defendants to submit to civil deposition, when resisting those civil defendants' demand for a trial setting in Cv 80–HM–1449–S, said:

> These [criminal] defendants all key to plaintiffs' case, *would likely take the Fifth Amendment in a civil trial* that preceded the criminal trial, thereby frustrating the civil proceedings. (emphasis supplied).

Apparently Mr. Dees believed that these defendants had no Fifth Amendment rights before they were indicted but have acquired those rights by virtue of the indictments he so fervently sought. While the United States is not bound by any concession made by Mr. Dees in light of the now recognized absence of any agency relationship between the two, at least Mr. Dees seems to acknowledge that the defendants still have a privilege against self-incrimination which would imply a need to inquire into the voluntariness of their submission to his depositions.

Because the facts surrounding the taking of the deposition of each defendant-deponent is, or may be, unique, all motions to suppress for an alleged lack of voluntariness will be carried with the case to trial, and each defendant will be afforded an opportunity without opening him to cross-examination on any other subject, to offer testimony relevant only to the issue of the voluntariness of his own deposition. The Government will, of course, have an opportunity to respond. This inquiry will be conducted outside of the presence of the jury, at which time the court will rule on the admissibility of the particular deposition to be offered by the Government. The burden of proof will be on the United States.

*(3.) Motion for Dismissal Based on Immunity.*

In the Solicitor General's memorandum filed in the Supreme Court of the United States in opposition to the petition of defendant Derane O'Neil Godfrey for a writ of certiorari the Solicitor General correctly conceded that the Eleventh Circuit had not been called upon to address, and did not address, the immunity issue now raised for the first time by defendants after remand. The Solicitor General's memorandum states at pages 10–11:

> Petitioner Godfrey argues (Pet. 6–15) that the court of appeals erred in concluding that the federal immunity statute, 18 U.S.C. 6001 *et seq.* does not apply in a private civil law suit. See *Pillsbury Co. v. Convoy [Conboy ]*, 459 U.S. 248, 261 n. 20[, 103 S.Ct. 608, 616, 74 L.Ed.2d 430] (1983) (reserving the issue whether the immunity statute applies in civil proceedings). Godfrey concedes (Pet. 9) that the court of appeals did not expressly so hold, but he reads the court's opinion to rest implicitly on that proposition. Such a reading of the decision below is incorrect and does not call for review by this Court.

> \* \* \* \* \* \*

> For this reason, it is clear that the court of appeals' decision does not hold, even implicitly that the immunity statute was inapplicable in the SPLC's lawsuit. Rather, the court rejected petitioner's Fifth Amendment claim on the merits, and it *had no occasion to address the statutory immunity issue in the circumstances presented here.* (emphasis supplied).

Because the "immunity" issue was not addressed by this court or by the Eleventh Circuit, the "law of the case" does not apply to this issue, which was an issue discussed in *Erwin* as the flip side of the "voluntariness" coin. *Erwin* argues strongly for "immunity" when a defendant is forced to testify. All defendants here, speaking through Godfrey's counsel, make a strong argument for statutory immunity

or, in the alternative for implied, equitable, or *de facto* immunity, but it occurs to this court that the immunity question, whether statutory or *de facto*, like the "voluntariness" question, can better be answered at trial by a consideration of evidence offered outside the presence of the jury and bearing on the issue. As requested by Godfrey and as suggested by *In re Martin-Trigona*, 732 F.2d 170 (2d Cir.1984), and *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), a mini-hearing will be conducted at or immediately prior to trial on the issue of immunity as to each defendant who claims it. It certainly cannot apply to those two defendants who were not deposed. Preparation on this issue should not unduly burden either the United States or any defendant, and the court sees no compelling reason for ruling in advance of trial on the issue.

*(4.) Motion for Dismissal on the Basis of Alleged Preindictment Delay.*

 In its memorandum opinion of November 14, 1985, this court voiced concern over the possible prejudice which may be occasioned by the absence of defense witnesses resulting from the long passage of time between the events described in the indictment and the bringing of the indictment. In its order of July 27, 1984, from which the United States appealed, this court found:

> ... the delay which took place after the reopening of the file on December 7, 1982, was for the purpose of obtaining tactical advantage.

The Government not having availed itself of the opportunity to review this finding when it had the opportunity, the finding has also become the "law of the case". Further, however, this court has found that defendants have failed to demonstrate prejudice of the kind recognized in *United States v. Puett*, 735 F.2d 1331 (11th Cir. 1984). Perhaps this finding, too, has become the "law of the case" which would preclude the court's reopening of the issue despite the real possibility that actual and substantial prejudice may result from the death or unavailability of one or more material defense witnesses such as Valerie Vincent, Kelly Moore, Marion Gower and Pack Self, who was Chief of the Decatur Police at the time of the incident. The absence of Pack Self may be crucial to the question of if and how the SCLC parade was "administered" by the City. At least one of these four witnesses died after the United States took its interim appeal from the earlier suppression order. Defendants argue that by taking the said appeal the United States compounded the risk of substantial prejudice, and assumed that added risk. This is an intriguing argument, but one which, when like procedural circumstances occur, any defendant predictably would make. The difference here, of course, is that the United States waited until days before the statute of limitations ran before bringing the indictment in the first place. Nevertheless, the court is not ready to conclude on what has been presented that "substantial prejudice" will result from the long preindictment delay. The court is largely influenced on this issue by *Stoner v. Graddick*, 751 F.2d 1535 (11th Cir.1985), in which the Eleventh Circuit upheld a conviction after a 19 year pre-indictment delay. This court admits, of course, that in *Stoner* the indictment was not brought just days before the running of the statute of limitations, because the statute of limitations there was coterminous with the life of Stoner.

At trial the court will, of course, listen to the evidence with an eye to the prejudice, if any, which is caused by the absence of a particular witness or witnesses who, if living, could have testified concerning crucial facts in issue.

*(5.) Motion for Dismissal of the Indictment Based on the Character of the SCLC Parade and its Relationship with the City of Decatur.*

Count One of the indictment invokes 18 U.S.C. § 245(b)(2)(B) and 18 U.S.C. § 371. Count Two invokes 18 U.S.C. §§ 2 and 245(b)(4)(B). Count Three invokes 18 U.S.C. §§ 2 and 245(b)(4)(B). Counts One, Two and Three each involves activity dur-

ing a parade allegedly "provided and administered by the City of Decatur, a subdivision of the State of Alabama." While the indictment uses the conjunctive word "and", implying an undertaking by the Government to prove that the parade was both "provided" and "administered" by the City, the statute is alternative in its language, and the court will give the Government the benefit of an "or" instead of an "and" and overlook any sloppy draftmanship. Count Four, on an entirely different theory, charges defendants Handley, Steele, Riccio, Mason and White with obstruction of justice.

The first question to be answered is whether the SCLC parade described in the indictment was a "benefit, service, privilege, program, facility or activity" as those terms are used in 18 U.S.C. § 245. The government claims the parade was an "activity". Defendants argue the SCLC parade was not an "activity", citing the legislative history which enumerates the following "activities" covered by § 245:

Interference with voting in federal elections.

Interstate travel.

Interstate commerce.

Access to places of public accommodation.

Equal employment opportunity.

Equal enjoyment of state facilities such as public schools, municipal parks, public assistance programs and the electoral process.

1968 U.S.Code Cong. & Admin.News, at 1842.

There may be no mention of a "parade" as an "activity" in the legislative history, but the *history* could not be expected to mention everything. The maxim, "expressio unius est exclusio alterius" may apply to legislation itself but not to legislative history.

■ Judge Flannery in *United States v. Griffin*, 585 F.Supp. 1439 (M.D.N.C. 1983, 1984), held that a civil rights parade is an "activity" within the intended coverage of 18 U.S.C. § 245. This is the only expression on the subject from any federal court in the land, and while not binding on this court, persuades this court that the SCLC parade which used the public streets of Decatur in 1979 did constitute an "activity" protected by § 245 from interference. Judge Flannery's interpretation does arguably bring the constitutionality of the statute into question, in that it makes subsection (b)(5) susceptible to being interpreted as a proscription against a peaceful assembly which opposes a denial of the opportunity to participate in a peaceful assembly. Such an interpretation might trigger the principle of constitutional construction holding that in order for a statute *not* to violate "due process" it must make good sense in context. The constitutionality of this statute is not here challenged by defendants, and this court is inclined to agree with Judge Flannery that a parade which necessarily uses a public street (especially when the parade is designed to convey a message) is an "activity" within the purview of § 245.

The more important statutory issue is whether or not the public parade made the basis of this indictment was "provided or administered by the State or a political subdivision," another requirement in 18 U.S.C. § 245 if interference with the "activity" is to constitute criminal conduct. An essential element of the offense here charged is that the activity be "provided by" *or* "administered by" a governmental unit. In an earlier opinion this court indicated that it finds considerable merit in defendants' position respecting this issue. The undisputed fact is that this parade was not in anyway "provided" by the City of Decatur in the sense of being sponsored by or encouraged by the City. The Government does not seem to argue that the parade was "provided by" the City of Decatur. Reaching the alternative question, this parade was not supervised by that City pursuant to any city ordinance which required a parade permit. Judge Flannery in *United States v. Griffin*, as a crucial part of his finding that the City of Greensboro "administered" the parade, expressly relied on the following fact:

The Greensboro Code of Ordinances contains lengthy and highly specific requirements and regulations applicable to parades, and defines the responsibilities and functions of both parade participants and the City.

585 F.Supp. at 1442.

Judge Flannery's finding that the Greensboro parade was "administered" by the City depended upon the fact that Greensboro required a parade permit. In a second opinion entered in the Greensboro case on April 3, 1984, Judge Flannery held:

Defendants allege that the meaning of "administered" is an open question upon which wide ranging evidence should be adduced at trial. *The government asserts that the only factual question that the jury must decide, on this issue, is whether the City of Greensboro issued a parade permit for this parade. If the City issued a permit, argues the government, then as a matter of law the parade was "administered" by the City*, and Mr. Osborne's testimony as proferred is irrelevant.

\* \* \* \* \* \*

This Court finds, for the reasons stated above and in its Memorandum of October 6, that a parade for which a permit is issued by a city, *and* for which routine monitoring by the police was planned, is an activity "administered" by that city.

585 F.Supp. at 1444, 1446 (emphasis supplied).

This court notices Judge Flannery's careful use of the conjunctive word "and" rather than the disjunctive word "or". Judge Flannery reached his conclusion based on the undisputed fact, *argued by the government as the controlling fact*, that there was a parade permit.

■ Defendants in brief predict the following testimony on this subject:

1. There was no requirement that the SCLC apply for a parade permit or set forth the objectives, time, date or proposed route of parade.

2. The City placed no conditions on the parade.

3. The City did not limit the size of posts supporting plaques or signs.

4. The City did not inquire into the number of persons who would constitute the parade.

5. The City did not inquire into whether or not there would be vehicles in the parade.

6. The City did not establish a parade route.

7. The City in no way certified that the parade would interrupt the safe and orderly movement of traffic contiguous to its route.

8. The City imposed no limitations on the parades so as to assure that there would not be a harmful diversion of City services, *e.g.*, police officers, firefighting equipment or ambulance services.

As stated, an essential element of the offense here charged is that the parade was either "provided by" or "administered by" the City. The burden of proving this essential element is on the United States under the standard "beyond a reasonable doubt". Although defendants may correctly predict the evidence on the subject, a dismissal of the indictment now for a predicted failure of proof by the Government would be premature and would be uncalled for. If the Government fails to meet its burden of proof on this, or, for that matter, any other essential element of the offense, a motion for judgment of acquittal at the end of the Government's case will, of course, be in order. Without deciding the issue, this court tends to agree with Judge Flannery's use of the conjunctive "and", meaning, of course, that if there was no parade permit required or issued, it may portend badly for the United States.

*(6.) Motion for Continuance Pending Final Adjudication of the Civil Case.*

■ While this court strongly disagrees with Mr. Dees' formally expressed belief that the criminal case should proceed to a conclusion before his civil case is tried, and fully understands the desire, and perhaps the need, for the civil defendants, before their criminal trials, to obtain appellate re-

view of the civil judge's order requiring them to submit to deposition (a review which cannot take place until the civil case reaches final judgment), this court, as a criminal court, cannot await the final adjudication of a civil case which has now been pending since November 3, 1980, and in which the very first motion to dismiss has not yet been ruled upon. If this court granted such a continuance, the continuance might be for years, and that would be unfair both to the United States and to these defendants. Mr. Dees' response to the motion to set his civil case for trial has already been quoted several times. Pertaining to the issue now being addressed Mr. Dees said:

> Should there be convictions or additional guilty pleas [in the criminal case], they would be *res judicata* in the pending civil case.

This court cannot help but wonder out loud if an acquittal in the criminal case would be *res judicata* in the civil case? Speculation on this question is unnecessary to a determination of whether or not to continue the criminal case for an indeterminate period of time. Although the defendants' motions for a continuance have considerable merit under the unique circumstances, the motions will be denied.

*(7.) Motion for Severance.*

The following facts are relevant to the defendants' motions for a severance seeking a separate trial for each defendant.

A. All nine defendants are not named in each of the four counts of the indictment. Differing issues as between counts and as between defendants will complicate an already complicated jury trial and create a potential for the prejudice of one defendant by evidence bearing only on those counts in which he is not charged.

B. Two defendants out of the nine were not deposed in the civil case. Therefore, any controversy over the admissibility of civil depositions, whatever the outcome of the offers, might unduly prejudice these two.

C. The question of the voluntariness of each civil deposition will or may be controlled by differing facts and circumstances. The admissibility as to each must be decided separately, a fact which would necessarily elongate a combined trial and potentially be confusing to a jury.

D. Defendant Riccio is now in federal custody after his conviction of another federal crime. He will obviously be under careful surveillance during trial and his presence under the circumstances is potentially prejudicial to the other defendants.

E. The court has received several rather strange letters from defendant Riccio. They have not been shared with counsel but placed under seal. They indicate mood swings and unpredictable courtroom behavior.

F. Defendant Riccio only recently participated in a widely viewed CBS prime-time television program where he uttered threats and exhibited bizarre beliefs. The adverse publicity resulting from this program may have already slightly prejudiced both Riccio and his co-defendants. A brief filed by the United States in opposition to severance states, *inter alia:*

> Any prejudice associated with Mr. Riccio's comments [the CBS program] may be cured by severing him and trying the other defendants jointly.

The Government's brief does not mention the comments made by Mr. Dees on the same CBS program in which Riccio participated and their possible prejudicial effect. In any event the United States seems to be conceding that a joint trial, if it includes Riccio, may be prejudicial to the other eight defendants.

G. The Government will probably want to offer Riccio's T–V diatribe against him, and it may very well be admissible.

H. Two defendants, Mason and White, did not file suppression motions prior to the earlier appeal by the United States and are arguably not bound by the "law of the case" as a consequence of the Eleventh Circuit's mandate in *Handley,* to which they were not parties.

I. There is a very serious question as to the admissibility of an individual civil deposition taken of one defendant as against his co-defendants, even if voluntary. In its opinion in *Handley* the Eleventh Circuit clearly recognizes this serious problem by pointedly concluding its opinion with the following pregnant phrase:

> ... assuming satisfaction of confrontation concerns. *See United States v. Feldman,* 761 F.2d 380 (7th Cir.1985).

763 F.2d at 1406.

In its briefs the United States claims not to perceive any problem with the Confrontation Clause or with the Federal Rules of Evidence, and seems to expect that all civil depositions will be received into evidence at a joint trial. The United States overlooks both the language of Federal Rule of Evidence 804(b)(1) and the recent lesson in *Feldman,* cited favorably by the Eleventh Circuit in *Handley* as its very last remark. Rule 804(b)(1) states:

> (b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> > (1) *Former testimony.* Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, *if the party against whom the testimony is now offered,* or, in a civil action or proceeding, a predecessor in interest, *had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.*

Fed.R.Evid. 804(b)(1) (emphasis supplied). It will be difficult, if not impossible, for the United States to satisfy the exception contained in Rule 804(b)(1). It will have the burden of proving that "the party against whom the testimony is now offered had an opportunity and similar motive [in CV 80–HM–1449–S] to develop the testimony by direct, cross, or redirect examination." This view is solidly confirmed by *Feldman,* which dealt with very similar facts. There the Seventh Circuit says:

First, the co-defendants Feldman and Martenson did not have a meaningful opportunity to cross-examine Sanburg during his deposition. Although it is true that Feldman and Martenson had notice of the deposition, at the time of Sanburg's deposition the co-defendants had no knowledge of the agreement between the U.S. Attorney and Sanburg that Sanburg would not be the subject of the grand jury investigation. Nor did they have any formal notice of criminal proceedings against them, and the evidence discloses that the grand jury investigation had not commenced when Sanburg was deposed. Feldman and Martenson had no reason to suspect that Sanburg would incriminate them on criminal charges. In these circumstances, mere notice of the deposition does not constitute the opportunity, in any real sense, for Feldman and Martenson to cross-examine Sanburg. In *Phillips,* by contrast, the defendant had been indicted before the hearing and therefore knew or should have known that his accomplice might incriminate him on criminal charges.

\* \* \* \* \* \*

There is another distinguishing factor. Because no criminal indictment had been entered in the present case, the co-defendants would not have had the issues framed with sufficient clarity to allow for an intelligent cross-examination even if the defendants had been present during Sanburg's deposition. To contrast again with *Phillips,* the defendant knew at the time of Brownfield's interrogation of the specific charges that he was to defend against.

\* \* \* \* \* \*

The Sanburg deposition was the heart of the prosecution's case against the co-defendants. At the time of the deposition, however, no criminal charges were pending against Feldman and Martenson, they had no reason to suspect that they should cross-examine Sanburg, and there was no party at the deposition who could be deemed a predecessor in interest to

Feldman or Martenson. The trial court therefore erred in admitting the deposition under Fed.R.Evid. 804(b)(1). The admission of the deposition also violated the Confrontation Clause because the deposition did not bear sufficient indicia of reliability as articulated in *Ohio v. Roberts*, 1980, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 607–08, and in *United States ex. rel. Haywood v. Wolff*, 7 Cir.1981, 658 F.2d 455, 463, *cert denied*, 1981, 454 U.S. 1088, 102 S.Ct. 649, 70 L.Ed.2d 625.

*United States v. Feldman*, 761 F.2d 380, 383–84, 389–90 (7th Cir.1985).

These statements by the Seventh Circuit could just as easily have been made in the instant case. The only expression by the Seventh Circuit with which this court disagrees is its apparent belief that a civil deposition is admissible in a criminal trial if a "predecessor in interest" had an opportunity and reason to cross-examine. As this court reads Rule 804(b)(1) the words "in a civil action or proceeding" refer to the proceeding in which the deposition is *offered* and not to the proceeding in which it was *taken.*

Since the Eleventh Circuit decided *Handley,* citing *Feldman,* the Eleventh Circuit has also decided *United States v. Caldwell,* 771 F.2d 1485 (11th Cir.1985), which, like *Handley,* involved an alleged conspiracy. The Eleventh Circuit stated:

> We decide in this case whether the district court correctly excluded coconspirators' statements and whether the government presented substantial independent evidence, absent coconspirators' statements, of a conspiracy to commit extortion, as charged in Counts III and IV of the indictment.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> In this case ... the government sought to treat the coconspirators' statements as ordinary statements in evaluating their admissibility. Although the government advances a creative approach, it cannot overcome the fact that the testimony it presented comprised coconspirator statements, only admissible against the de-

clarant defendant in the absence of independent evidence showing a conspiracy. Fed.R.Evid. 801(d)(2)(A); [*U.S. v.*] *Zielie,* 734 F.2d [1447] at 1457 [ (11th Cir.1984) ]. *James* affords protection to a defendant from implication in a conspiracy through another defendant's or coconspirator's statements. The government has confused the distinction between the use of an alleged coconspirator's statement and the use of other extrajudicial statements.

771 F.2d at 1487, 1488.

The most recent expression by the Eleventh Circuit on this general subject is *United States v. Pendegraph,* 791 F.2d 1462 (11th Cir.1986), decided on June 23, 1986. It has particular relevance to the argument which the United States makes in the instant case that the various civil depositions can be successfully redacted to avoid prejudice, a procedure which is complicated and often unsatisfactory. In *Pendegraph,* the Eleventh Circuit discusses the introduction of a redacted version of a confession by one defendant over the objection of his co-defendant. The Eleventh Circuit explains:

> In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) the Court held that the admission of a nontestifying defendant's statement in a joint trial, implicating a co-defendant, violated the Confrontation Clause. *Because the declarant is unavailable for cross-examination, the "powerfully incriminating extrajudicial statements of a co-defendant who stand accused side by side with the defendant" cannot be tested. Id.* at 135, 88 S.Ct. at 1628. However, if otherwise admissible, the statement may be admitted if all references to the co-defendant are deleted. *United States v. Key,* 725 F.2d 1123, 1126 (7th Cir.1984). The introduction of a redacted confession may still violate the *Bruton* rule if the statement compels a directly inculpating inference. *United States v. Garrett,* 727 F.2d 1003, 1013–14 (11th Cir.1984); *see United States v. Satterfield,* 743 F.2d 827, 849 (11th Cir.1984); *English v. United States,* 620 F.2d 150,

152–53 (7th Cir.1980); *United States v. Hicks,* 524, F.2d 1001, 1003 (5th Cir. 1975).

We believe that Mickels' statement, even as redacted, clearly implicated Pendegraph. In light of the other evidence presented by the Government, including the testimony of Dill and the T.V.A. employee, and the physical evidence of dye stains on Pendegraph's check and jacket, the jury could very easily infer Pendegraph to be the "individual" referred to in Mickels' confession, if only because there was no other possibility. *See United States v. Burke,* 700 F.2d 70, 85 (2d Cir.1983) (redacted statement clearly inculpatory where jury is aware that names have been deleted and in light of other evidence could infer they included co-defendant's).

However, *the statement must also be vitally important to the Government's case in order for its introduction to create a constitutional violation.* 791 F.2d at 1465 (emphasis supplied). The fact that the United States in the instant case took an interim appeal in order to overturn the earlier suppression order indicates how "vitally important to the government's case" the depositions of Handley, Steele, Riccio, Tucker and Godfrey may be. The only purpose for introducing the depositions will be to inculpate not only the particular deponent but others named or identified by the deponent.

 The Eleventh Circuit recently reiterated the controlling principle of Rule 14, F.R.Cr.P., in *United States v. Taylor,* 792 F.2d 1019, 1022–23 (11th Cir.1986), as follows:

A motion for severance is addressed to the sound discretion of the district court and will be reversed only if that discretion is abused.

*Id.* Fearing that this court would not be able to afford adequate protection against possible prejudice to these defendants in a joint trial of this complicated case, the court exercises its discretion so as to grant all defendants' motions for a severance, conditioned on defendants' clearly implied

waivers of the Speedy Trial Act to the extent necessary, inasmuch as the defendants must realize that the court cannot try nine defendants both separately and at the same time, and for the purposes of minimizing prejudice for trial publicity there should be at least a short time lapse between trials.

The parties have been previously requested to suggest to the court a line up of the cases for trial in the event of a severance, and several of the parties, through counsel, have responded. Because defendant Riccio is clearly the most volatile defendant, his case will be tried last. Because there is no consensus, except as to Riccio, as to a line-up, the other eight cases will be tried in the reverse order as the defendants are named in the indictment.

An appropriate separate order will be entered.

### ORDER

In compliance with the accompanying Memorandum Opinion, it is ORDERED, ADJUDGED and DECREED by the court as follows:

1. Defendants' motions to suppress each civil deposition on the basis of allegedly newly discovered evidence are DENIED. The motions of defendants Mason and White are not "renewed motions" but original motions. They are nevertheless also DENIED.

2. Defendants' motions to suppress each civil deposition based on the allegation that it was not voluntary are DENIED, but without prejudice to reconsideration at trial after hearing the evidence bearing on the issue.

3. Defendants' motions for dismissal based on an alleged grant of immunity, express or *de facto,* are DENIED, but without prejudice to reconsideration at trial after hearing the evidence bearing on the issue.

4. Defendants' motions for a dismissal of the indictment on the basis of alleged preindictment delay are DENIED.

5. Defendants' motions for a dismissal of the indictment, or of certain of its counts, based on an allegation that the SCLC parade was not a "public activity" and/or was not "administered" by the City of Decatur are DENIED, but without prejudice to reconsideration at trial at the close of the government's case.

6. Defendants' motions for a continuance pending final adjudication of CV 80–HM–1449–S are DENIED.

7. Defendants' motions for a severance are GRANTED, and the nine defendants, as thus severed, are hereby SET FOR TRIAL as follows:

Godfrey, August 11, 1986, at 9:30 A.M.
Tucker, August 25, 1986, at 9:30 A.M.
White, September 29, 1986, at 9:30 A.M.
Mason, October 20, 1986, at 9:30 A.M.
Creekmore, November 3, 1986, at 9:30 A.M.
Kelso, November 10, 1986, at 9:30 A.M.
Steele, November 17, 1986, at 9:30 A.M.
Handley, November 24, 1986, at 9:30 A.M.
Riccio, December 1, 1986, at 9:30 A.M.

▮▮▮▮▮ When defendants' motions for continuance were filed all defendants waived the requirements of the Speedy Trial Act. The court necessarily DEEMS the motions for a severance to include a continuing waiver of the Speedy Trial Act as to those defendants who will therefore not be reached for trial within the precise limitations of the Act because of sequential trials. Therefore, in compliance with 18 U.S.C. § 3161(h)(8)(A) the court EXPRESSLY FINDS that the ends of justice will be served by sua sponte continuances granted to conform to the above schedule of trial settings and that the taking of this action outweighs the interest of the public and of the defendants in a speedy trial.

In addition to any voir dire questions which the parties would ordinarily be expected to present to the court prior to jury selection, the parties are INSTRUCTED to submit to the court on or prior to August 8, 1986, briefs and any proposed voir dire questions addressing the jury selection problem inherent in this particular case which involves a well publicized black-white confrontation, as a result of *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

UNITED STATES OF AMERICA,

v.

TERRY JOE TUCKER.

## ON RENEWED MOTION TO SUPPRESS

On July 14, 1986, this court entered a multifaceted Order in *United States v. Roger David Handley, et al.,* with an accompanying Memorandum Opinion. However, because the individual defendants have been severed for trial, the following opinion deals only with *United States v. Terry Joe Tucker,* although the court will use the same enumeration of subject matter used in its Opinion of July 14, 1986.

(1) *The Renewed Motion To Suppress.*

The renewed motions to suppress by all defendants were based on new evidence which came to light after remand by the Eleventh Circuit. Tucker now again seeks to have his two depositions taken by Mr. Dees in *People's Association of Decatur v. The Invisible Empire,* CV 80–HM–1449–S, suppressed on the ground, now more clearly supported, that Mr. Dees' "sole purpose" was to obtain an indictment of Tucker and his fellow Klansmen. On July 14, 1986, the court denied all said motions. After July 14, 1986, three new pieces of evidence bearing on this issue have come to the court's attention. First, Tucker has now testified without contradiction that immediately after Mr. Dees deposed him on August 17, 1983, in CV 80–HM–1449–S Mr. Dees predicted that there would be federal indictments but said that he, Mr. Dees, might be able to forestall an indictment of Tucker if he would "cooperate". Tucker's testimony about Mr. Dees' statement on August 17, 1983, implies at least two things. One is that Mr. Dees had some control over the Government's intentions and potential actions. The other and possibly more impor-

tant implication is that the The Peoples Association's suit against Tucker could be dismissed as against Tucker if Tucker would only testify in a "would be" criminal case against his fellow Klansmen. The second new piece of evidence is that Mr. Dees, who contended in pleadings filed by him in CV 80–HM–1449–S that a criminal conviction in this case would be *res judicata* in CV 80–HM–1449–S, has not bothered to file a motion for summary judgment or any other pleading in CV 80–HM–1449–S to take advantage of the plea of guilty recently entered in this case by Tucker's co-defendant, Derane O'Neil Godfrey. The gravamen of both the criminal and the civil case is a conspiracy to interfere with the SCLC parade. A lawyer seriously interested in obtaining the relief he seeks against a civil defendant would surely request a summary judgment based on the clear adjudication of liability in another case. Third, despite Mr. Dees' close monitoring of this case he still has not obtained service in CV 80–HM–1449–S on defendant Ricky Lynn Creekmore, even though he was reminded on July 14, 1986. As recently as August 25, 1986, Mr. Stanton, who is Mr. Dees' "Klan-Watch" investigator, testified for the Government in this case. Mr. Dees keeps up with this case better than he keeps up with his own case.

These three additional pieces of evidence now convince the court beyond doubt that Mr. Dees' "sole purpose" in filing CV 80–HM–1449–S was to press for criminal indictments of the Klan marchers, but the court remains equally convinced that the "law-of-the-case" precludes a suppression of Tucker's civil depositions *on this ground.*

*United States v. Tucker* was set for jury trial on August 25, 1986. On August 18, 1986, the United States suddenly, and for the first time, announced that it did not intend to offer into evidence in its case-in-chief against Tucker, Tucker's depositions taken by Mr. Dees in CV 80–HM–1449–S on February 17, 1983, and August 17, 1983. This revelation came as a complete shock in light of the vigorous prior appeal taken by

the United States from the Order of this court entered on July 27, 1984, and the accompanying Memorandum Opinion at 591 F.Supp. 1257. When it filed its notice of appeal in 1984, did the United States know that it had no intention of offering these depositions against Tucker? If so, the speedy trial implications are serious. In any event, the issue of the admissibility *vel non* of these two civil depositions against Tucker has suddenly and unexpectedly become moot, and there is no purpose to be served in further attempting to interpret Mr. Dees' motives except as those motives may bear on other issues to be discussed.

(2) *Motion To Suppress Because of Involuntariness Of Deposition.*

This motion has become moot except as it bears on the admissibility of the fruits or by-products of Tucker's civil depositions if they were, in fact, involuntary. This issue of voluntariness overlaps the next issue and will therefore be discussed under the next heading.

(3) *Motion For Dismissal Based On Immunity.*

After the United States belatedly announced its intention not to offer Tucker's civil depositions, Tucker immediately requested a pre-trial hearing on the question of immunity. He argues that immunity necessarily results from the circumstances surrounding his civil depositions in CV 80–HM–1449–S. Tucker contends that the coercive nature of his civil depositions provides him full or "transactional" immunity. Alternatively, he argues that if he is not entitled to "transactional" immunity then he is entitled to "use" immunity, which would preclude the introduction of any of the fruits of his said depositions. Without deciding the issue of transactional immunity the court has earlier ruled that Tucker enjoys at least use immunity because of the court's finding that the civil depositions were not voluntary. Without conceding that the civil depositions were involuntary, the United States requested a so-called *Kastigar* hearing for the purpose of giving

it an opportunity to provide the court with an evidentiary basis for a determination that it nevertheless has a meritorious case against Tucker from sources independent of Tucker's civil depositions. *See Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The court conducted such a hearing.

The United States, although now declining to offer Tucker's civil depositions into evidence, argues that they were not involuntary, and, as a "fall back" position, argues that Tucker previously waived all of his Fifth Amendment rights as to the transaction made the subject of this criminal action by voluntarily testifying in 1980 about the same events in a state criminal case entitled *State of Alabama v. Robinson.* The court will explore these issues.

### A. TRANSACTIONAL IMMUNITY

 Tucker argues that what happened to him in CV 80–HM–1449–S was so egregious as to entitle him to an absolute equitable or *de facto* immunity from prosecution as to what he testified about under federal court compulsion. The earlier brief filed by his co-defendant Godfrey, which Tucker has adopted, argues that 18 U.S.C. §§ 6001, *et seq.,* provides immunity here. Section 6002 says:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information *in a proceeding before or ancillary to a court or grand jury of the United States* ... and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but *no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in a criminal case....*

18 U.S.C § 6002 (1976) (emphasis supplied).

The *ex parte* order entered on February 8, 1983, by the district court in CV 80–HM–1449–S before Tucker was deposed on February 17, 1983, painted a very graphic picture of the dire consequences which would eventuate if Tucker did not identify himself and his alleged co-conspirators at the times and places where the alleged conspiracy supposedly culminated. In its order of February 8, 1983, the district court asked this question:

> Does the materiality of the information requested outweigh any possible reason a defendant might have to fail to disclose?

The court then proceeded to answer its question:

> The materiality of this information to the plaintiffs outweighs *any claim of privilege* to which defendants may otherwise be entitled.

(emphasis supplied).

The court concluded with this flat statement:

> Therefore they [*including Tucker* ] *are no longer entitled to claim any privilege.*

(emphasis supplied).

As the Supreme Court noted in *Lefkovitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977):

> ... when a State [or a United States district judge] compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the Fifth Amendment and cannot be used against the declarant in a subsequent criminal prosecution.

97 S.Ct. at 2135.

Tucker points to the following language from *In re Martin-Trigona,* 732 F.2d 170 (2d Cir.1984):

> Section 6003(a) states that the appropriate district court shall issue an order compelling testimony upon request of a duly authorized United States attorney in accordance with the provisions of Section 6003(b) "[i]n the case of *any* individual who has been or may be called to testify or provide other information at *any* proceeding before or ancillary to a court of

the United States...." (emphasis added). Presumably Congress understood the implications of the phrase "any proceeding before a court of the United States." Section 6001 defines "court of the United States" to include bankruptcy courts. This is further evidence of Congress' intent to apply these provisions to bankruptcy proceedings.

732 F.2d at 172 (citing 18 U.S.C. § 6003(b) (1976)) (emphasis in original).

From this, Tucker argues:

> ... the Order compelling the depositions included no grant of immunity pursuant to 18 U.S.C. §§ 6002–6003. The discovery compelled by the civil discovery order constituted a "proceeding before or *ancillary* to a court ... of the United States" and therefore the Prosecutorial, or Executive Branch of the Government is charged with the excesses of the Judicial Branch. This relationship between the Branches of Government is not only common sensical but is also mandated by the immunity statute's provision for Executive recommendation and Judicial approval of immunity. Thus, the civil discovery violated the carefully balanced federal immunity procedure.

*Lefkovitz v. Cunningham* indicates that the State of New York gives a declarant *transactional* immunity on all matters about which he testifies unless he effectively waives his Fifth Amendment rights. 97 S.Ct. at 2135 n. 3. There is no such absolute rule in Alabama or in the United States generally. This court has already indicated at 591 F.Supp. 1257, 1261 that the district court in CV 80–HM–1449–S thought on February 8, 1983, that Tucker was immune by virtue of the closing of the federal investigation and the running of the criminal statute of limitations. This court is not prepared to find that the court in CV 80–HM–1449–S actually intended by its order of February 8, 1983, to grant transactional immunity, even if that court could have done so without a request from a duly authorized United States attorney. This court is unwilling to recognize a new principle of accidental transactional immunity, as

pressed upon it by Tucker, who insists that immunity here mandates a dismissal of the indictment. To recognize such a principle would run directly counter to the Eleventh Circuit's holding in *United States v. Gottesman*, 724 F.2d 1517 (11th Cir.1984):

> It is well settled in this circuit that a district court has no authority to grant statutory immunity under 18 U.S.C. § 6002 to a defense witness for the reason that such authority resides exclusively in the executive branch.

724 F.2d at 1524 n. 7.

## B. USE IMMUNITY

While the United States denies that Tucker's depositions in CV 80–HM–1449–S were *involuntary*, the United States has not satisfactorily met its burden of proving that the depositions were, in fact, *voluntary*, and the fact that the United States has chosen not to offer the depositions against Tucker cannot be satisfactorily explained except as a concession that they were, in fact, coerced. For its proof the United States relies entirely upon the order of February 8, 1983, the Tucker depositions and the testimony of Tucker at the recent voluntariness hearing. The clear import of the order of February 8, 1986, has perhaps already been discussed too much. The United States argues that the order only required Tucker to identify persons present at the Decatur melee, as if such coerced information is innocuous. Placing Tucker and his alleged co-conspirators at the scene of the crime can hardly be described as innocuous. It constitutes the very core of the federal indictment. Second, the "bottom line" of the order of February 8, 1983, was not narrow or confined to the allegedly innocuous. It purported to remove *all right to assert any constitutional privilege*.

The United States necessarily retreats to the argument that Tucker was made aware prior to and during his deposition of February 17, 1983, of his Fifth Amendment rights, and he thereupon knowingly waived them. There are several obvious answers to this argument. First, at the very begin-

ning of Tucker's deposition the following pre-deposition stipulation appears:

> IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and *that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered into evidence, or prior thereto.*

(emphasis supplied).

If this language is given its ordinary meaning, all objections except as to form or leading questions were totally unnecessary during the deposition, and the privilege against self-incrimination can be invoked at the time the deposition is offered, that is, if it is ever offered by Mr. Dees, or anyone else.

This court has now had an opportunity to observe Tucker and to hear his live testimony. Tucker testified before this court (1) that a few days before his February 17 deposition he had read and thought he understood the order of February 8; (2) that his lawyer, Mr. Willingham, confirmed to him that he had to answer Mr. Dees' questions and never explained to him anything about the Fifth Amendment; (3) that in an off-the-record discussion during the first deposition Mr. Dees told him that he would be jailed and/or fined if he refused to answer; and (4) that he was unaware of any personal criminal exposure arising from his conduct in May, 1979, until he was actually indicted in May, 1984. Considering the backgrounds and demeanors of Tucker and of Mr. Willingham, who testified at the previous suppression hearing, the court reluctantly resolves any conflict between the recollections of Tucker and Mr. Willingham as to what transpired prior to and during the deposition of February 17, 1983, in Tucker's favor. The whole story is told in Tucker's deposition of February 17, 1983, in which the following colloquy took place:

Dees: Who is this fellow right next to him? [pointing to photograph].

Tucker: I don't know.

Dees: You don't know who that is?

Tucker: No.

Willingham: Now, rather than doing it each and every time you show him a photograph, I'm going to object. I suppose you are going to show him who some people are and I'm going to object to it on the First and Fifth Amendment rights.

Dees: *The court has already ruled. These questions have to be answered.*

Willingham: *Yeah, you have to answer.*

(emphasis supplied).

While there was no purpose to be served by Mr. Willingham's lame objection under the circumstances, this colloquy clearly reveals that Mr. Willingham and Mr. Dees interpreted the order of February 8, 1983 the same. That order was unequivocal and devastating.

■ On August 26, 1986, during oral argument on the voluntariness question counsel for the United States made much of the fact that Mr. Willingham invoked the Fifth Amendment on February 17, 1983, against Mr. Dees' questions about Tucker's alleged ownership and possession of a gun on an occasion not connected with the Decatur march. This was counsel's argument:

> He [Tucker] asserted that right when asked about a firearm. He said, "I am not going to answer that question" where his counsel said "We will not answer that question based upon a fifth amendment privilege against self incrimination." In fact, Mr. Dees, basically, said, "I understand, fine." Then the questioning moved on to another area. So clearly from the very face of that deposition, Mr. Tucker had a Fifth Amendment right. He and his attorney demonstrated a willingness to assert that right *where appropriate.*

(emphasis supplied).

The key words are "where appropriate". Mr. Dees, and this court, well understand the difference between asserting a Fifth Amendment privilege against questions designed to elicit material relevant to the issues in CV 80-HM-1449-S, as expressly

required by the order of February 8, 1983, and questions probing into possible separate criminal conduct in an entirely different context and on a different occasion. Mr. Dees obviously understood this distinction better than does present counsel for the Government. Tucker's reluctance to answer questions about his totally irrelevant ownership and/or possession of a gun at a different time and place alerted even Mr. Willingham that the inquiry was getting far afield. The entire colloquy must be examined in order to see that all Fifth Amendment rights, even about the gun, were overridden roughshod by Mr. Dees. The following occurred even after Mr. Willingham's futile protest:

> Dees: All right. What kind of weapons did you have?
>
> Tucker: Let's see. I had an AR-15 semiautomatic rifle and a .45 automatic pistol. That's all the weapons that I had.
>
> Dees: Do you still have the AR-15?
>
> Tucker: No.
>
> Dees: What did you do with that?
>
> Willingham: I object on the ground that might tend to incriminate him.
>
> Dees: Are you instructing him not to answer, is that what you are saying?
>
> Willingham: Let me talk to him a second.
>
> (WHEREUPON, at this time Mr. Willingham confers with the defendant).
>
> Dees: Do you instruct him not to answer it?
>
> Willingham: Yes.
>
> * * * * * *
>
> Dees: All right, my question again is what did you do with the AR-15 rifle?
>
> Willingham: I'm sorry. Go ahead and answer the question then.
>
> Tucker: It was sold.
>
> Dees: Okay, who did you sell it to?
>
> Tucker: I don't remember the guy's name. It was sold at trade day at Lacon down there.

Tucker's deposition of February 17, 1983 at 41, 44.

After hopefully construing this deposition testimony as a knowing waiver of Tucker's Fifth Amendment rights, counsel for the United States alternatively argued:

> Again, the Supreme Court is quite clear that if in fact Mr. Tucker should have done anything [at his civil deposition] *he should have challenged that order.*

How could Tucker have challenged the order? This court agrees that if Tucker had been represented by a highly competent attorney, his attorney might have advised him that the criminal statute of limitations for conspiracy to violate others' civil rights had not run (something Mr. Willingham clearly did not do, probably because he shared Judge Haltom's view), and that it would be the better course for Tucker to go to jail for contempt and then attack the order of February 8, 1983, with a petition for *habeas corpus,* and/or to permit a default judgment to be entered against him and then take an appeal to the Eleventh Circuit. In effect, the United States, in suggesting that in order for Tucker to avoid self-incrimination at a time when the FBI had closed its investigation and a federal judge had strongly ordered Tucker to answer upon penalty of a possible million dollar default judgment and/or jail for contempt, he should have stonewalled. This, of course, constitutes a severe criticism of Mr. Willingham by the United States. This criticism may be justified, but it *does not prove* that Tucker's deposition testimony was *voluntary.* Tucker's deposition testimony was, in fact, coerced.

Finally, the United States orally argued that long prior to his February 17, 1983, deposition, Tucker had knowingly waived his Fifth Amendment privilege as to the Decatur events by testifying in a state criminal proceeding in 1980. Counsel for the United States concluded his oral argument as follows:

> The facts are clear, your Honor, they had the privilege and they chose to *waive* it.

(emphasis supplied).

Long ago the old Fifth Circuit recognized the classical definition of "waiver".

> A waiver may be defined as the intentional relinquishment of a known right

with both knowledge of its existence and an intention to relinquish it.

*Watkins v. Fly,* 136 F.2d 578, 580 (5th Cir.) *cert. denied,* 320 U.S. 769, 64 S.Ct. 80, 88 L.Ed. 459 (1943).

To "waive" a right as important as the right against self-incrimination should certainly be no easier than to "waive" less important rights.

The court will discuss *infra* the separate question of the voluntariness of Tucker's testimony at the *State v. Robinson* trial in 1980. However, for the purpose of considering whether or not the fruits of Tucker's civil depositions in CV 80–HM–1449–S are to be deemed voluntary because of an alleged prior waiver in 1980, the only question is, "Did Tucker's testimony in *State v. Robinson* constitute a continuing waiver as to any future testimony by him on the same subject?" The Eleventh Circuit has answered this question in *United States v. Fortin,* 685 F.2d 1297 (11th Cir.1982), a case involving the review of a lower court's finding of contempt in which the Government claimed that the witness had waived his Fifth Amendment privilege by his prior voluntary testimony on the same subject. There the Eleventh Circuit stated:

> The Government cites *Rogers v. United States,* 340 U.S. 367, 373, 71 S.Ct. 438, 442, 95 L.Ed. 344 (1951), for the proposition that "where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details." It is contended that the existence of prior inconsistent sworn statements was already sufficiently incriminating as to the crime of perjury so as to effectively result in a waiver by the appellants of their right to not further discuss the matter.
>
> While the rule being urged by the Government is a valid one, *it is generally one applicable when the "disclosure of the details" is being sought in the same proceeding where the intitial "criminating facts have been voluntarily revealed." E.g., United States v. St. Pierre,* 132 F.2d 837, 839 (2nd Cir.1942) (L. Hand, J.), *cert. dismissed as moot,*

*St. Pierre v. United States,* 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943). It has been held that

> [t]he privilege [against self-incrimination] attaches to the witness in each particular case in which he may be called on to testify, and whether or not he may claim it is to be determined without reference to what he said when testifying as a witness on some other trial, or on a former trial of the same case, and without reference to his declarations at some other time or place.

*In re Neff,* 206 F.2d 149, 152 (3rd Cir. 1953). *See Ballantyne v. United States,* 237 F.2d 657, 665 (5th Cir.1956) (citing *In re Neff* with approval). *Cf. United States v. Willcox,* 450 F.2d 1131, 1141–42 (5th Cir.1971) (involving concerns that the scope of questioning at the second trial might be broader than at the first) *cert. denied Wilcox v. United States,* 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 787 (1972). *This principle is generally accepted as "hornbook law," and, with one exception, has been adopted by all federal courts which have considered it.* 685 F.2d at 1298–99 (emphasis supplied) (footnotes omitted).

Applying *Fortin* to the present facts it cannot be legitimately argued that by testifying in *State v. Robinson* Tucker forever waived his Fifth Amendment privilege as to the Decatur events. *If* Tucker knowingly waived his Fifth Amendment rights in 1980 during the *State v. Robinson* trial, and then waived them again in 1983 in the CV 80–HM–1449–S depositions, why does the United States not simply put him on the stand in the present case and ask him the same incriminating questions asked by Mr. Dees in 1980 and in 1983? The court hopes that even Mr. Dees would not suggest such a course of action.

■ The court finds not only that Tucker's depositions in CV 80–HM–1449–S, which the United States now decides not to offer in its case-in-chief, are inadmissible, but that all evidence derived directly or indirectly from those depositions are like-

wise tainted and will be inadmissible at trial. *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *Ellis v. United States,* 416 F.2d 791 (D.C.Cir.1969). As recently as 1985 the Eleventh Circuit cited *Murphy v. Waterfront Commission,* for the following propositions:

> The natural corollary that one cannot be compelled to give evidence against one's self in connection with a criminal case is that if one *is* compelled to give evidence against one's self, that evidence cannot be used in a criminal case. [citing *Murphy* ]
>
> \* \* \* \* \* \*
>
> In essence, the privilege against self-incrimination affords a form of use immunity which, absent waiver, automatically attaches to compelled incriminating statements as a matter of law. Given this, any grant of use immunity to the plaintiffs would have been duplicative.

*Hester v. City of Millegeville,* 777 F.2d 1492, 1496 (11th Cir.1985) (emphasis supplied).

Perhaps it was a reading of this court's opinion of July 14, 1986, which caused the United States to decide not to offer Tucker's civil depositions, fondly hoping that Tucker would go to sleep on his use immunity argument.

As a result of the evidence offered at the *Kastigar* hearing, the court concludes that the United States possesses considerable relevant evidence against Tucker not traceable to the involuntary civil depositions in CV 80–HM–1449–S and which pre-date those civil depositions. Precisely what evidence (some of which has purposefully not been revealed by the court to the defendant) will be admissible at trial remains to be seen. Evidentiary rulings will necessarily await the trial itself with the exception of Tucker's testimony in 1980 in *State v. Robinson.* It will necessarily be dealt with here.

(4) *Motion For Dismissal On The Basis of Preindictment Delay.*

Tucker has reargued his contention of preindictment delay due to the lost testimony of Decatur police chief Pack Self who died prior to the 1984 indictment and whose statement given to the FBI in 1979 contains meaningful exculpatory material. Of course there are other now missing witnesses who might have been able to help Tucker's defense. If the court believed that the United States had *deliberately* delayed the indictment for the purpose of obtaining a tactical advantage, the court would surely dismiss the indictment. The mere fact that the Southern Poverty Law Center and Mr. Dees were more aggressive than the FBI, which closed its file in 1979, does not mean that the United States deliberately delayed for the purpose of obtaining a tactical advantage. As things have turned out, the United States has, in fact, obtained a tactical advantage, but the tactical advantage has, in effect, been forced upon it by Mr. Dees. No malice aforethought is attributable to the Government inasmuch as the "law of the case" proves that Mr. Dees was not the Government's alter ego. Mr. Dees was not inhibited as the FBI was by the constraints of "due process" and the Fifth Amendment, so the F.B.I. cannot be criticized for any lack of diligence.

(5) *Motion For Dismissal Of The Indictment Based On The Character Of the SCLC Parade And Its Relationship With The City Of Decatur.*

No further discussion of this topic is appropriate or necessary.

(6) *Motion for A Continuance Pending Final Adjudication Of The Civil Case.*

No further discussion of this topic is appropriate or necessary.

(7) *Motions For Severance.*

No further discussion of this topic is appropriate or necessary.

(8) *Motion To Suppress The Testimony of Tucker Given In State v. Robinson.*

This is a new issue not discussed in the opinion of July 14, 1986, because on July 14, 1986, neither this court nor Tucker had seen the transcript of Tucker's 1980 testimony. The principles enunciated in the opinion of July 14, 1986, bearing on the voluntariness of the civil depositions in CV 80–HM–1449–S and in this opinion under heading (3) above are also applicable on the question of voluntariness of Tucker's testimony in *State v. Robinson*, testimony which Tucker has now moved to suppress on the ground that it was not voluntary and was given without waiving his Fifth Amendment privilege against self-incrimination. A good introduction to the facts in *State v. Robinson* can be found in *Robinson v. State*, 430 So.2d 883 (Ala.Crim.App. 1983), in which the Court of Criminal Appeals affirmed Robinson's conviction.

When Tucker's 1980 testimony was first brought to light on August 20, 1986, the United States first said that it *"might"* offer the testimony as a confession in its case-in-chief. The United States then, with seeming reluctance, decided that it *"would"* offer the 1980 testimony. This quickly precipitated Tucker's motion to suppress. The facts pertinent to a decision on the voluntariness of Tucker's 1980 testimony in *State v. Robinson* are these:

A. Mr. Dees in his capacity as defense counsel for Curtis Robinson in 1980 issued a subpoena for Tucker to appear as a defense witness. Mr. Robinson was a black man charged with assault with intent to murder arising out of alleged violence committed by him in Decatur, Alabama, on May 26, 1979, during the SCLC—KKK confrontation.

B. Upon receiving his subpoena, Tucker, who had previously had no experience with legal proceedings, civil or criminal, called Mr. Dees, a lawyer he did not know. Mr. Dees told Tucker that he did not need a lawyer. In effect, this was telling Tucker that he had nothing to worry about. Mr.

Dees, in effect, was saying, "I'll look out for you".

C. The FBI had interviewed Tucker shortly after the events of May 26, 1979. Tucker had heard nothing further about the event except, perhaps, a sharing in the common knowledge that the FBI had closed its file on the event. The following findings contained in this court's opinion of July 27, 1984, have not been gainsaid:

... on October 26, 1979, the U.S. Attorney's office advised "that after reviewing all of the reports relating to the confrontation of May 26, 1979, between Ku Klux Klansmen and city police officers of Decatur, Alabama, no federal statutes were violated during the course of the incident."

\* \* \* \* \* \*

The fact that the federal investigation had been concluded without prosecution was soon well known to the general Alabama population, including both Ku Klux Klansmen and Southern Poverty Law Center....

*United States v. Handley*, 591 F.Supp 1257, at 1258–59 (N.D.Ala.1984). This background only confirmed Tucker's belief, already carefully engendered by Mr. Dees, that Tucker had nothing to worry about. He came to the *Robinson* trial without having consulted an attorney and without an attorney accompanying him.

D. Tucker was "duly sworn to speak the truth, the whole truth and nothing but the truth". Trial transcript of *State v. Robinson* at 1326, and Government's Exhibit 10 in *Kastigar* hearing conducted by this court. Tucker's questioning by Mr. Dees began without Tucker's first being given any warnings or admonitions, either by Mr. Dees or by the judge. Between pages 1326 and 1337 of the transcript of the Robinson trial Mr. Dees first asked Tucker several questions which now clearly appear to be incriminating. Some of these questions were objected to by the State prosecutor on grounds of relevancy, but Mr. Tucker was required to answer. On prior occasions Tucker may have intimidated people by wearing a white robe. He

was certainly intimidated in 1980 by a man wearing a black robe. It took little, or no intimidation, when Tucker "had nothing to worry about".

E. After Tucker had identified himself as the Exalted Cyclops of the Cullman Klavern and as a Commander in the Klan's Special Forces, which according to Tucker provided "a security force for marches and rallies", the following exchange took place:

Dees: Would you name—you are the Commander and Chief of the Klan's Special Forces. Name your second in command.

Tucker: I don't have a second in command.

Dees: Name the members of the Klan Special Forces. You refuse to testify on the grounds your answer may tend to incriminate you? Your honor I don't want to take advantage of the witness. If he claims that we will let him claim that.

The Court: He hasn't done it. Let him go ahead and answer the question.

Dees: The judge says you have to go ahead and answer.

Trial transcript of *State v. Robinson* at 1330.

Tucker was more confused and intimidated than enlightened by this enigmatic colloquy. He did not have the slightest comprehension of this as some sort of a warning to assert a privilege. He did not understand it as a suggestion, or even a hint, that further answers would constitute a waiver of an important constitutional privilege. Tucker was totally unschooled on constitutional rights. He was not a mentally agile person in 1980, in 1983 or in 1986. He may have been a bad man, but he was without guile at the *Robinson* trial. After this colloquy, which the United States now characterizes as a knowing waiver, Mr. Dees asked Tucker one leading question after another, eliciting from him not only incriminating information about his Klan connections but about the actual events leading up to and including the Decatur incident. Tucker testified at the *Robinson* trial, as he did later during his deposition

sitions in CV 80–HM–1449–S to most, if not all, of the essential elements of the charges now contained in the federal indictment against him.

F. On June 5, 1984, early in this criminal case, Tucker moved for the disclosure of all statements made by him and in the possession of the United States or known to it, and all exculpatory material. On June 7, 1984, magistrate Reddoch, considering Tucker's request as having been made under Rule 16, F.R.Cr.P., ordered:

The U.S. Attorney shall make an appropriate response.

Rule 16, F.R.Cr.P., provides:

Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; ...

\* \* \* \* \* \*

If, prior to or during a trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, he shall *promptly* notify the other party or his attorney or the court of the existence of the additional evidence or material.

\* \* \* \* \* \*

If at anytime during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, *or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.*

Rule 16(a)(1)(A), (c), (d)(2), F.R.Cr.P. (emphasis supplied).

G. On June 15, 1984, Tucker moved for an *in camera* inspection of statements to

see if the prosecution had failed to turn over any exculpatory material. On June 22, 1984, magistrate Reddoch denied this motion.

H. On June 21, 1984, magistrate Reddoch, in response to a co-defendant's motion for a standing discovery order in the entire case, held:

> The gov't [sic] has a continuing obligation to disclose appropriate discovery materials requested by the defendants. In view of the rules providing for discovery in criminal cases, no standing discovery order is deemed necessary.

I. On June 26, 1984, the United States responded to Tucker's motion for Brady material by saying that it would provide Brady material "in accordance with the dictates of *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392 [49 L.Ed.2d 342] (1976)". On the very same day the Government admitted: " ... the Government has an obligation to provide the names of those unindicted co-conspirators it plans to use as witnesses at trial, *United States v. Barrentine,* 591 F.2d 1069 (5th Cir.1979). . . ."

J. On June 26, 1984, the United States also opposed Tucker's motion for the providing of investigative services under 18 U.S.C. § 3006A(a). The United States took the position that Tucker had not been found financially unable to pay for such services, although Tucker had been found financially unable to pay for an attorney. The magistrate refused to provide investigative services for Tucker.

K. On July 12, 1984, Tucker filed a motion complaining that the United States had furnished less than magistrate Reddoch's order of June 7, 1984, required. On July 17, 1984, the United States responded:

The gov't [sic] has ... informed defense counsel of its intention to provide additional discovery ... in accordance with Rule 16, Fed.R.Civ.P. as soon as the material is available to the government.

L. The precise date upon which the United States, or any of its agents, first learned of Tucker's testimony in *State v. Robinson* is conspicuously absent from the Government's evidence, but counsel for the United States first delivered Tucker's counsel a copy of Tucker's 1980 testimony on August 20, 1986, in open court. This was the first time either Tucker's counsel or Tucker had actually seen it. This was also the first time the court had ever heard about it. Counsel for the United States stated that on August 6, 1986, he told Tucker's counsel by telephone that he had some additional discovery materials for him, but they were not precisely described, and the *Robinson* trial testimony was not mentioned.

M. On August 20, 1986, at the same time the United States first informed Tucker and the court that it would not offer Tucker's civil despositions taken in CV 80–HM–1449–S, the United States told the court that it "might" offer the testimony which Tucker gave in *State v. Robinson.* This case was already set for trial on August 25, 1986. When pressed, the United States changed "might" to "will".

N. On August 23, 1986, counsel for the United States first attempted to explain why Tucker's *Robinson* testimony had not been delivered to the defendant sooner. Counsel's letter of that date reflects that the United States obtained portions of the *Robinson* transcript from Mr. Dees at least a year before finally showing them to Tucker's counsel less than a week before Tucker's trial.[1]

---

**1.** August 23, 1986

Honorable William Acker
District Court Judge
United States District Court
Northern District of Alabama
1800 North 5th Avenue
Birmingham, Alabama
Dear Judge Acker:

 Pursuant to defendant Tucker's motion of August 22, 1986 and related discussions involving counsel in chambers, I wish to advise the Court of the following facts concerning the Government's compliance with Rule 16, Federal Rules of Criminal Procedure, and the recent tender of defendant Tucker's testimony from the *Robinson* trial.

 On June 5, 1984, a Motion for Production or Disclosure was filed by counsel, requesting statements made by defendant Tucker in the possession of the Government. The Govern-

Note 1—Continued

ment filed a response to that motion on June 26, 1984 and on June 28, 1984 provided counsel with a packet of materials including all Rule 16(a) statements then in the Government's possession, for which a receipt was obtained. A copy of that receipt is enclosed herein. At the same meeting, counsel was given an opportunity to view a videotape and photographs taken during the events of May 26, 1979. On June 28th, I also advised defendant Tucker's counsel that the Government would provide additional Rule 16 material as it was discovered or became available. Specifically, I assured counsel that we would tender any additional criminal records pertaining to his client and would arrange a timely viewing of trial exhibits.

At this time I was unaware of Mr. Tucker's participation during the *Robinson* trial and had made not efforts to obtain copies of that trial transcript. Accordingly, that material was not included in the initial discovery tender.

Shortly thereafter, in conjunction with the suppression hearings in July of 1984, the United States arranged for all parties to receive copies of all depositions filed by the plaintiffs in the related civil suit. With the Court's suppression order and the subsequent appeal of that order by the United States, further proceedings before this Court were stayed indefinitely.

Following the Eleventh Circuit's decision in *United States v. Handley, et al.,* and in anticipation of renewed progress toward trial, I requested a copy of the *Robinson* trial transcript from Mr. Robinson's defense attorney, Morris Dees. I made that request on the assumption that Mr. Dees would prove faster than the local clerk of court in locating and forwarding the trial record. It appears that my assumption was correct, in light of Mr. Bynon's unsuccessful attempts to obtain a similar transcript from the clerk's office more than a year ago. My purpose in obtaining the *Robinson* transcript was to review the testimony of those police officers who were expected to appear as Government witnesses in the instant case.

Although I cannot provide a specific date, I believe the Government acquired the *Robinson* transcript during the late summer or early fall of 1985. Thereafter, the Court continued the case again pending resolution of two petitions for writs of certiorari before the Supreme Court. With the case continued indefinitely again, I shifted my attention to other cases and investigations, and filed the *Robinson* transcript without considering the possible implications for disclosure under Rule 16.

More recently with the Court's decision to grant severance, the Government's trial preparation focused on defendant Godfrey's trial scheduled for August 11, 1986. Following the tentative acceptance of defendant Godfrey's guilty plea, counsel for the Government began preparation for the Tucker trial and began reviewing material to insure compliance with Rule 16, as well as Jencks and *Brady.* As part of that review, Mr. Bynon was contacted by telephone and advised that additional material, including

his client's testimony at the *Robinson* trial, would be forthcoming. That arrangement seemed satisfactory to Mr. Bynon. On August 20, 1986 material was provided and a receipt was signed. A copy of that receipt is enclosed herein.

I can assure the Court that at no time did the Government seek to mislead or withold material from defendant Tucker. To the contrary, the Government has attempted to comply expeditiously with all requests from defense counsel. Our failure to tender the *Robinson* testimony was first received in the fall of 1985 was unintended and inadvertent.

Sincerely yours,
Craig B. Shaffer
Trial Attorney
Civil Rights Division
United States
Department of Justice

Terry Joe Tucker
FBI Statement, 6–7–79
Deposition Transcript, 2–17–83
Medical Records for Kenneth D. Collier
Medical Records for James W. Ferguson, Jr.
Copies of photographs taken on 5/26/79, 98 photographs
Copies of negatives taken on 5/26/79, 6 pp.
Defendant's prior criminal record
Received by: /s/ R.P. Bynon
Date: 6/28/84

United States v. Tucker

Discovery material made available to Defense Counsel:

Brady Material —

FBI Statements (302s):

| Pg. 3 | 83 | | |
|---|---|---|---|
| | | 257 | 300 |
| 4 | 84 | | |
| | | 262 | 301 |
| 5 | 85 | | |
| | | 263 | 302 |
| 9 | 88 | | |
| | | 271 | 304 |
| 10 | 89 | | |
| | | 272 | 305 |
| 11 | 91 | | |
| | | 273 | 306 |
| 12 | 92 | | |
| | | 274 | 307 |
| 13 | 93 | | |
| | | 275 | 313 |
| 18 | 102 | | |
| | | 276 | 314 |
| 19 | | | |
| | 109 | 277 | 315 |
| 20 | | | |
| | 110 | 278 | 316 |
| 21 | | | |
| | 155 | 279 | 317 |
| 22 | | | |
| | 156 | 280 | 318 |
| 23 | | | |
| | 157 | 281 | 319 |

O. On August 22, 1986, Tucker orally moved to suppress the testimony he had given in *State v. Robinson.* He assigned the separate and several grounds that his 1980 testimony was not voluntary and that its belated offer constitutes an egregious violation of Rule 16, F.R.Cr.P., and of the prior orders of this court.

P. On August 22, 1986, Tucker renewed his motion to dismiss or in the alternative for a continuance.

Q. With the actual selection of a jury having been scheduled for August 25, 1986, and delayed for one day, and with the venire sitting in the jury assembly room, the United States on August 26, 1986, first delivered to Tucker's counsel exculpatory materials which it had previously failed to deliver. Apparently there has been considerable confusion over whether properly unredacted versions of certain exculpatory statements were furnished to all defendants shortly after magistrate Reddoch's orders of June, 1984. Nothing whatsoever was furnished to Tucker between June, 1984 and August 20, 1986. On August 26, 1986, the day after the case had been set for trial, the United States for the first time furnished Tucker an FBI interview of August 13, 1979, indicating that Jerome Stewart, a Decatur pawn broker, said to an FBI agent "that the blacks in particular redeemed most of the weapons that they had pawned through his shop" shortly before the events of May 26, 1979, and that on "Thursday prior to Saturday, May 26, 1979, Cleam Peoples [a black marcher] purchased a 30 round clip as well as a box of .30 caliber ammunition". Further, a statement given by Jerry Noel Sharp, a Decatur police officer, taken on June 29, 1979, by the FBI, was delivered for the first time on August 26, 1986. Among other things it indicates:

He [officer Sharp] advised that also prior to the time the initial shots were fired, the blacks dispersed from their group and went towards the Klansmen....

\* \* \* \* \* \*

Officer Sharp advised that he heard two shots from the area where the blacks were....

These failures to comply with Rule 16 are egregious.

 The sanction of dismissing an indictment for a Rule 16 violation is so rare as to be virtually non-existent. Nevertheless, Rule 16 is clear in its meaning and purpose. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), expressly acknowledged by the United States in its response to Tucker's Rule 16 request, applies both to Brady material and to a defendant's prior statements. In *Agurs* the Supreme Court said:

... the prudent prosecutor will resolve doubtful questions in favor of disclosure.

96 S.Ct. at 2399–2400.

Here, there was nothing doubtful about the requirement that the prosecutor furnish Tucker a copy of his testimony in *State v. Robinson.* After offering an apology, the United States incongruously and lamely argues that Tucker's counsel, by an exercise of due diligence, could himself have obtained a copy of Tucker's 1980 testimony.

Note 1—Continued
Pg. 24

| | | | |
|---|---|---|---|
| | 158 | 282 | 322 |
| 65 | | | |
| | 159 | 287 | 323 |
| 74 | | | |
| | 160 | 288 | 324 |
| 75 | | | |
| | 161 | 289 | 325 |
| 76 | | | |
| | 162 | 298 | 1/28/86 |
| 77 | | | |
| | 163 | 299 | 1–2 |

GRAND JURY TESTIMONY:
*Bertis E. Kilgo;* 1/4/84; pp. 1–97.
*Frederick Wayne Thompson;* 10/4/83; pp. 1–58.

*Herbert Campbell, Jr.;* 11/7/83; pp. 1–90.
*Jerry W. Lamar;* 11/7/83; pp. 1–42.
*Don Lee;* 10/4/83; pp. 1–37.
*George W. Bushong;* 10/4/83; pp. 1–46.
*Cattenia Lamar;* 12/12/83; pp. 1–45.
*Ann Shaffer;* 12/12/83; pp. 1–100.
Rule 16 Material:
FBI Criminal Record; 6/25/84; 1 p.
Cullman County, AL Case Action Summary (Criminal); 10/6/82; 3 pp.
Transcript of Testimony from *State of Alabama v. Curtis Robinson;* pp. R–1326–53.
Received by: /s/ R.P. Bynon, Jr.
 Date: August 20, 1986

This is an argument without any basis in fact or reason. There is no valid excuse for the United States' failure to comply with Rule 16. It furnished this material so late that Tucker was unable, as a practical matter, to take advantage of it or to follow up on it. This prejudice may have been relieved to an extent by the automatic temporary continuance occasioned not by Tucker, but by the United States in its last minute decision making. In the instant case, without attempting to describe all of the disclosure shortcomings by the United States, the court will briefly examine two more. First, on the Wednesday before a Monday trial, the United States for the first time furnished Tucker the testimony of a Decatur police officer given in *State v. Robinson.* The officer testified against Curtis Robinson that he saw Robinson prior to the confrontation with the Klan and that Robinson held his pistol up, stating that he was "going to get him a couple of them dudes". The United States, when a key issue obviously is the jury determination of whether the SCLC or the KKK was the initial aggressor, argues in defense of its failure to reveal this exculpatory testimony, that it is not material inasmuch as the criminal conspiracy ended prior to the firing of any shots. This is a patently spurious argument. The indictment charges "interference" with the SCLC parade. It is not a federal crime to conduct a non-violent counter-demonstration. This means, of course, that such "interference", in order to constitute a federal crime, must be of the physical variety. If a jury should find that peaceful Klan protesters, exercising their First Amendment rights, only reacted to SCLC violence, the verdict would be "not guilty". The statement of the pawn broker delivered for the first time to Tucker on August 26, 1986, with the venire in the courthouse and the witnesses subpoenaed, is unforgivable. Apparently, without the court's strong re-explanation to the United States of the character and range of possible exculpatory materials in this case, the United States would *never* have given Tucker this information. Also, the Government to this very date, as far as this court

has been able to ascertain, has not furnished to Tucker the names of the unindicted co-conspirators *who it intends to call as witnesses*, as it formally promised on July 26, 1984. This failure not only clearly violates the principle set forth in *United States v. Barrentine,* 591 F.2d 1069, 1077 (5th Cir.1979), but also the principle reiterated in *United States v. Burkhalter,* 735 F.2d 1327 (11th Cir.1984). Certainly, had the case gone to trial, and Tucker been convicted, the numerous Rule 16 violations, if they had thereafter been discovered, would have required a setting aside of Tucker's conviction. *United States v. Willis,* 759 F.2d 1486, 1499 (11th Cir.1985). The court is tempted to avail itself of the following expression by the Eleventh Circuit in *United States v. Euceda-Hernandez,* 768 F.2d 1307 (11th Cir.1985):

A district court's decision to impose a Rule 16(d)(2) sanction for the violation of a discovery order, *and thus its choice of sanction, is a matter committed to the court's sound discretion.*

*Id.* at 1311 (emphasis supplied).

There is, however, an obvious distinction in severity between the dismissal of an indictment and the suppression of certain evidence. The court here opts for the latter, not being willing to stretch its discretion to the outer limit despite unforgiveable Rule 16 violations.

Tucker's principal attack on the admissibility of his testimony in *State v. Robinson* is not the lateness of its disclosure to him, but his insistence that it was not voluntarily given and did not constitute a waiver of his Fifth Amendment privilege. No case law announced either by the Supreme Court or by the old Fifth Circuit or by the Eleventh Circuit has been found directly on point. Each case which the controlling appellate courts have decided seems to have features which distinguish it from the instant case. The court will do its best to distill the essence from these cases.

First, the general law on the subject must be recognized. The Supreme Court stated in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964):

... [T]he American system of criminal prosecution is accusatorial, not inquisitorial, and ... the Fifth Amendment privilege is its essential mainstay. Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth. Since the Fourteenth Amendment prohibits the States from *inducing a person to confess through "sympathy falsely aroused." or other like inducement* far short of "compulsion by torture," it follows *a fortiori* that it also forbids the States to resort to imprisonment, ... to compel him to answer questions that might incriminate him.

84 S.Ct. at 1493 (emphasis supplied) (citations omitted).

In other words, there are more subtle ways of obtaining an involuntary confession than the rubber hose. This is also the theme of *Lynum v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), in which the Supreme Court stated:

It is thus abundantly clear that the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off and her children taken from her, if she did not "cooperate." These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up." *There was no friend or advisor to whom she might turn. She had no previous experience with the criminal law,* and had no reason not to believe that the police had ample power to carry out their threats.

83 S.Ct. at 920 (emphasis supplied).

Contemporaneously with *Malloy* and *Lynum* the Supreme Court said in *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963):

... *[O]f course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances.*

83 S.Ct. at 1343 (emphasis supplied).

These cases do not require a custodial setting in order for a confession to be deemed involuntary. It is the *totality* of circumstances which must be examined. In *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court reiterated this principle:

A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.

84 S.Ct. at 1783.

Once the United States denied Tucker's insistence that his testimony given in *State v. Robinson* was involuntary, the United States assumed the burden of proving that Tucker's testimony was, in fact, voluntary. This triggered a last minute evidentiary hearing under circumstances in which neither Tucker nor his attorney had ever seen the *Robinson* trial testimony until the hearing. Credibility necessarily became a crucial factor. The evidence offered by the United States did not include any oral testimony by Mr. Dees, nor by the State's prosecutor in *State v. Robinson,* nor by the trial judge in *State v. Robinson.* Instead, the United States relied entirely on the *Robinson* trial transcript itself and on Tucker's oral testimony at the evidentiary hearing. This court saw and heard Tucker. Tucker testified that when he was subpoenaed by Mr. Dees he was led to believe that he had nothing to worry about and he did not consult with nor bring a lawyer. It never occurred to him that he was exposing himself in any way to criminal prosecution or that he was waiving any Fifth Amendment privilege. In any event it is highly unlikely even if he had understood the Fifth Amendment that he would have clammed up. The courtroom pressure was too great. To expect Tucker to have raised the Fifth Amendment after being sworn and sitting in the witness box without counsel in front of a judge and jury is unrealis-

tic. This court believes Tucker when he now swears, albeit by way of conclusion, that he did not waive his claim against self-incrimination in 1980.

■ The following highly pertinent remark was made by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963):

> This Court has consistently held that state factual determinations not fairly supported by the record cannot be conclusive of federal rights. Where the fundamental liberties of the person are claimed to have been infringed, *we carefully scrutinize the state-court record.*

83 S.Ct. at 758–59 (emphasis supplied) (citations omitted).

Upon reading the cold transcript of Tucker's testimony in *State v. Robinson* and comparing it with Tucker's current live recollection of that trial situation, this court remains unconvinced that Tucker voluntarily acknowledged in 1980 facts which would go a long way toward proving the Government's case against him in 1986. Mr. Dees' questioning in 1980 involved the guilt or innocence of Curtis Robinson. It did not involve the guilt or innocence of Tucker. The questions of "intent", of "understanding", of "ability to resist" and "credibility" are all intertwined and implicated when any trial judge decides whether a particular confession was voluntary or coerced. The scope of this inquiry is eloquently described in *United States v. Brierly*, 267 F.Supp. 274 (E.D.Pa.), *aff'd*, 384 F.2d 992 (3d Cir.1967).

> If the confession is involuntary, it must be excluded. The simple reason is that due process cannot in any case condone the use of evidence which is elicited from a defendant without the concurrence of his *conscious, free, unfettered will*, whatever its otherwise probative value. We prize too highly the right of the individual "to be let alone" to permit the police to profit from their improprieties. It is not enough to say that a confession was not obtained against the will of the defendant: the confession can be admitted only if the defendant willed it, if he

*actively, freely and voluntarily* chose to confess.

267 F.Supp. at 282 (emphasis supplied). Considering Tucker's knowledge, comprehension and position when he testified in 1980, he cannot be said to have *consciously, freely* and *intentionally* confessed to a criminal act. In 1980 he was as much of a naive and awed witness as he was in 1983 at his civil depositions in CV 80–HM–1449–S, and as a witness before this court in 1986.

The court is not unmindful of *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), upon which the United States now places much emphasis. In *Murphy* a probationer revealed self-incriminating information to his probation officer without formally asserting any Fifth Amendment privilege. The trial judge found the statements to be voluntary and allowed the Government to introduce them against the probationer in a criminal prosecution based on the information thus obtained. A *Miranda* warning is only required in a custodial setting. Neither the accused Murphy nor the non-accused Tucker was in custody when he made self-incriminating remarks. Murphy was in a much more informal and comfortable setting than Tucker. Tucker was a subpoenaed witness in a state criminal prosecution where he had an aggressive lawyer, a judge and a jury glaring at him. While these differences are apparent, the truly crucial difference between Murphy's case and the instant case is that in *Murphy the trial judge, who saw and heard the probation officer and the other testimony surrounding the question of voluntariness, decided on the evidence that the interview of Murphy was not in such a coercive setting as to make it involuntary.* It was an *appellate court*, the Supreme Court of Minnesota, which, without having seen the witnesses, erroneously decided that such a setting is inherently and inevitably coercive. This makes it quite understandable why the Supreme Court reversed the Supreme Court of Minnesota and followed the *nisi prius* evaluation of the evidence.

Other Supreme Court cases deserving comment are the companion cases, *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), and *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977), and *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Washington* the Supreme Court found that a defendant's grand jury testimony could be used against him. The marked difference between *Washington* and the instant case is that in *Washington* detailed and comprehensive warnings were given the witness against self-incrimination, and the defendant, in response to the question, "Now, do you understand these rights, sir?", said, "Yes, I do". 97 S.Ct. at 1817. Furthermore, the subject matter of the grand jury questioning of Washington was of such a nature as to alert even the most ignorant person that his answers, if truthfully made, might tend to incriminate him.

*Wong* is also distinguishable. There, a grand jury witness was indicted for perjury committed before the grand jury. She moved to suppress her false testimony on the ground that she was whip-sawed between lying and telling the truth, either course of action creating potential criminal liability. This court recognizes a substantial difference between a grand jury setting where a witness is a potential target and a criminal petit jury setting where the witness is *not* the defendant, is testifying *for* the defendant, and is *not* a target of the prosecution. Also, in *Wong*, the court recognized that "[b]efore any interrogation began, respondent was advised of her Fifth Amendment privilege". 97 S.Ct. at 1824. The first issue addressed by the Supreme Court was whether or not the witness actually understood this warning. The district court and the Ninth Circuit had both found that the witness had not comprehended the warning, and thus "was confined either to incriminating herself or lying under oath". 97 S.Ct. at 1825. Based on their finding that she did not comprehend, the district court and the Ninth Circuit had suppressed her perjured testimony. The Supreme Court's entire rationale in *Wong* is that the

Fifth Amendment privilege "does not protect perjury". 97 S.Ct. at 1827. The Supreme Court recognized "that potentially incriminating questions will frequently be asked of witnesses subpoenaed to testify before the grand jury; the very purpose of the inquiry is to ferret out criminal conduct...." 97 S.Ct. at 1826. If the purpose of Mr. Dees' subpoenaing of Tucker in *State v. Robinson* was to ask him "potentially incriminating questions" and to "ferret out criminal conduct", as was true in *Wong*, Mr. Dees certainly disguised it well by telling Tucker that he would not need a lawyer. Wong was not deliberately deceived by her interrogator.

*Elstad* dealt with an admittedly voluntary, signed confession made after *Miranda* warnings were given. The defendant, however, argued that his confession was inadmissible because of a prior remark made by him *without* the benefit of *Miranda* warnings. *Elstad* might be apposite here if the Tucker depositions in CV 80–HM–1449–S had been voluntary and were being offered by the United States. Using the *Elstad* rationale these depositions would not have been fruit of a poisonous tree *if* the testimony in *State v. Robinson* had been voluntary. *Elstad* is designed not to "disable the police from obtaining the suspect's informed cooperation even when the official coercion proscribed by the Fifth Amendment played no part in either his warned or unwarned confessions". 105 S.Ct. at 1294. In 1980 Tucker was no longer under investigation by the FBI. He had not only *not* received any *Miranda* warnings, but he had no reason to suspect that he was a target. This was certainly not true of defendant Elstad. To interpret *Elstad* as the United States would now interpret it would drastically delimit *Elstad* and expand it far beyond the circumstances of that case. The Court in *Elstad* only *held:*

We *hold* today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing

after he has been given the requisite *Miranda* warnings.

105 S.Ct. at 1298 (emphasis supplied).

Tucker's questioning in 1980 was not "uncoercive", and he did not thereafter waive his rights and voluntarily confess, with or without *Miranda* warnings. *Elstad* does not provide guidance in Tucker's case.

This court does not believe that these Supreme Court decisions stand for the proposition that no matter how deceived, how misled, how ignorant, or how afraid a subpoenaed witness may be while testifying before a jury and a judge, that the witness' answers, thus induced, may be used against him, and that the witness is waiving his Fifth Amendment right to refuse to answer possibly incriminating questions without any prior warning of that right. This court finds that *Crane v. Kentucky*, —— U.S. ——, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), has the effect of ameliorating *Elstad, Wong* and *Washington*, and limiting them to their facts. *Crane* was delivered on June 9, 1986, *by a unanimous court*. The single most penetrating statement of controlling principle appearing in *Crane* is:

> The *manner* in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States [and all federal courts] assign to the *trial judge alone* to resolve. But the *physical* and *psychological environment* that yielded the confession can also be of substantial relevance....

106 S.Ct. at 2145–46 (emphasis supplied) (citations omitted).

A trial judge obviously must have considerable discretion to weigh the fundamental fairness of using as evidence against an accused, his own confession. All of the circumstances appertaining at the time of the "confession" must be considered. If the court is incorrect in its reading of *Crane*, then this case will provide the appellate vehicle for a dramatic expansion of the use of deceit and pressure against the unwary far beyond any criticisms of *Elstad, Wong* and *Washington* voiced by Justices Brennan and Marshall in their dissents in those cases. This court would like to think that a reconciliation of *Elstad, Wong* and *Washington* took place in *Crane*.

Reflecting some of the concerns about *Wong* shared by this court, the Fifth Circuit commented on *Wong* as follows in *United States v. Whitaker*, 619 F.2d 1142 (5th Cir.1980):

> The defendant finally contends that his grand jury testimony should have been suppressed because he was not told that he was a potential defendant and was not advised of his constitutional rights under the Fifth Amendment. The defendant concedes that such warnings are not constitutionally required. *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 56 L.Ed.2d 231 (1977), but he asks this court to exercise its supervisory jurisdiction to enforce the "better practice" of informing a potential defendant of his constitutional rights. *United States v. Jacobs*, 531 F.2d 87 (2d. Cir.) *vacated and remanded*, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277 *aff'd on remand*, 547 F.2d 772 (2d. Cir.1976) *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978). Although we agree that it is a better practice to so inform a potential defendant prior to his testimony before a grand jury, this is not an appropriate case for an exercise of our supervisory jurisdiction.
>
> In *Jacobs* the court suppressed the defendant's grand jury testimony in a case where the perjury count was "essentially a strategic ploy which would make conviction on the substantive count easier if the counts were to be joined in a single trial." *United States v. Jacobs*, 547 F.2d 772, 775 (2d Cir.1976) (on remand), *cert. dismissed*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978). In the instant case, however, there is no evidence that the government was attempting to set a trap for the defendant. There is some indication that the defendant may have been a target at the time of his testimony, but there are also indications that the

government expected the defendant to testify truthfully and did not intend to prosecute him for the substantive offense being investigated. In fact, distinguishably from *Jacobs*, the defendant was never charged with a substantive offense. Under the circumstances of this case, we decline to exercise our supervisory jurisdiction to suppress the defendant's grand jury testimony.

619 F.2d at 1149–50.

The Government was not attempting to set a trap for Tucker in 1980. It was totally uninterested in Tucker at that time and blissfully unaware of *State v. Robinson*. Tucker was not the target of any active FBI investigation in 1980. To use the words of *Whitaker* Mr. Dees' actions may have been a "strategic ploy", but he was not the Government, even if he acted like it. Tucker's case may be one for an exercise of "supervisory jurisdiction" to suppress his 1980 testimony. On this point the court notes with interest that the Fifth Circuit in *Whitaker* cites with favor *ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function* (Approved Draft 1971), Section 3.6(d), as follows:

If the prosecutor believes that a witness is a potential defendant he should not seek to compel his testimony before the grand jury without informing him that he may be charged and that he should seek independent legal advice concerning his rights.

619 F.2d at 1150 n. 13.

Although Mr. Dees was not a formal "prosecutor" he probably thought of Tucker as a potential criminal defendant, because he named him as one a few months later. *Whitaker* hardly sounds like judicial acceptance with open arms by the old Fifth Circuit of subtly compelled testimony. Instead, it voices a deep concern with the protection and preservation of Fifth Amendment rights. In order to be found involuntary, a confession need not be the product of torture or a lack of drinking water, pointed out by the United States, with flourish, as being absent in the present case. Whether erroneous or not, Tucker thought that the trial judge in *State v. Robinson* was requiring him to answer Mr. Dees' questions. Why shouldn't Tucker have answered? He was induced by Mr. Dees' promise that he had nothing to worry about. He was forced by the subpoena and the judge. Is a person who swears to possibly self-incriminating facts after being told he has no criminal exposure, supposed to figure out that this inducement is a clever misrepresentation? Must every guilty person go through life expecting deceit from officers of the court? Mr. Dees, an officer of the court in *State v. Robinson*, and an officer of this court, has not denied Tucker's version of their conversations in 1980 or in 1983. There might have been more reason in 1983 for Tucker to defy the federal judge in CV 80–HM–1449–S (since The Peoples' Association's complaint specifically sought information of possible federal criminal conduct) and in 1980 when the FBI file on the Decatur incident had been closed and Tucker had been advised by an ostensibly friendly lawyer who had not yet sued him that Tucker did not need a lawyer.

In addition to this court's finding that Tucker's 1980 testimony was not, in fact and law, voluntary, there is an alternative but overlapping reason for its suppression. The United States obtained knowledge and possession of Tucker's 1980 testimony only as the fruit of the involuntary civil depositions taken in 1983 by Mr. Dees. When the United States offered as its exhibit during the *Kastigar* hearing the trial transcript of Tucker's testimony in *State v. Robinson*, the transcript was hopefully and ostentatiously marked by the United States "Inevitable Discovery". Yet, the United States admits that this transcript was not discovered by it until after the 1983 civil depositions had been taken by Mr. Dees. Frankly, the United States would not have discovered the 1980 transcript in *State v. Robinson* without the investigation conducted by Mr. Dees under the auspices of CV 80–HM–1449–S. Apparently the United States wants this court to

indulge in the gross speculation that the FBI would have "lucked into" this transcript on its own. Why should the FBI, without Mr. Dees' help, be expected to find something in 1984 which was a matter of public record in 1980 and the subject of an opinion by the Alabama Court of Criminal Appeals in 1983 (*Robinson v. State*, 430 So.2d 883 (Ala.Crim.App.1983)), and which counsel for the United States only learned about *after* its successful appeal from the Eleventh Circuit to the earlier suppression hearing? The question answers itself. By invoking *Kastigar* the United States only emphasizes the obvious, namely:

> This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead" and also barring the use of any evidence obtained by focussing investigation on a witness as a result of his compelled disclosures.

406 U.S. at 460, 92 S.Ct. at 1664–65.

On the other hand:

> ... the Fifth Amendment allow[s] the government to prosecute using evidence *from legitimate independent sources.*

92 S.Ct. at 1665 (emphasis supplied).

If the Government is serious in trying to remove the 1980 testimony from use immunity by an application of the doctrine of "inevitable discovery", it has failed to read *United States v. Satterfield*, 743 F.2d 827 (11th Cir.1984), in which this court learned the hard way by finding that it had misapplied the doctrine. There a shotgun was found in a kidnapper's hideout during a search before a warrant could be obtained. The Eleventh Circuit said:

> The elements of the inevitable discovery rule in this circuit were set forth in a former Fifth Circuit case, *United States v. Brookins*, 614 F.2d 1037 (5th Cir.1980). To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and *the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior*

*to the occurrence of the illegal conduct. Id.* at 1042 n. 2, 1048. *See also* [*U.S. v.*] *Roper*, 681 F.2d [1354] at 1358 [11th Cir. 1982]. Because the second element is not satisfied here, we hold that the shotgun was not admissible under the inevitable discovery expection.

743 F.2d at 846 (emphasis supplied and in original).

An application of this language to the instant set of circumstances makes the Governments' "inevitable discovery" argument ridiculous. The testimony which Tucker gave in 1980, only discovered by the United States in 1985 because of the 1983 depositions, surely cannot be considered to have been uncovered through "legitimate independent sources" in the prosecution's hands and being actively pursued before the 1983 depositions. The United States has not offered a single piece of credible evidence to prove otherwise. Therefore, the 1980 "confession" is due to be suppressed on the secondary, alternative ground that it is fruit of the poisonous tree.

## CONCLUSION

This court finds provocative the opinion of Honorable Jose A. Cabranes, of the United States District Court for the District of Connecticut, in *Wilkinson v. Forst*, 639 F.Supp. 518, entered as recently as June 30, 1986. It is certainly timely. Judge Cabranes enjoined Connecticut law enforcement officials from patdown searches of all persons attending local Klan rallies as violative of the Fourth Amendment. Judge Cabranes pointedly said:

> The venerable Justice Oliver Wendell Holmes observed more than a half-century ago that "if there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." It has since been recognized in many difficult circumstances that "[f]reedom of thought carries with it the freedom to speak freely and to publicly assemble to express one's thoughts."

These fundamental principles of American constitutional law must guide the court in resolving the important issue raised in this litigation—namely, whether the stopping and searching of all persons attending political rallies sponsored by the Invisible Empire Knights of the Ku Klux Klan ("the Klan") in the State of Connecticut infringe rights guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution.

It is useful at the outset to take note of those matters that are *not* at issue in this litigation. Most importantly, this lawsuit does not concern the merits of the political philosophy espoused by the Klan or by those organizations that have vehemently protested the Klan's presence in the State of Connecticut and sought to interfere with the public expression of the Klan's views. Indeed, the court could not decide this case on the basis of its approval or disapproval of the political views held by one or more of the parties, for, as the Supreme Court has instructed, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of the judges and juries but on the competition of other ideas."

*Wilkinson v. Forst*, 639 F.Supp. 518, 519 (D.C.Conn.1986).

The rights of Tucker, as a citizen, cannot be colored or determined by his racial philosophy or his Klan affiliation. He is entitled to a fair trial comporting with the requirements of due process and devoid of the use by the prosecution of involuntary, self-incriminating evidence.

An appropriate separate order will be entered.

### SUPPLEMENTAL ORDER

In accordance with the accompanying Memorandum Opinion the motion of Terry Joe Tucker to suppress the testimony which he gave in *State v. Robinson* in 1980 in the Circuit Court of Morgan County, Alabama, is GRANTED, and the said testimony is SUPPRESSED.

The renewed motion of Terry Joe Tucker to dismiss the indictment or in the alternative for a continuance is DENIED in both aspects, and the case against Tucker is SET FOR TRIAL on September 29, 1986, unless a timely appeal is taken by the United States. If such an appeal is taken, the trial of *United States v. Lenwood Lewis White* will proceed as previously scheduled on September 29, 1986.

All other prior rulings of the court are REAFFIRMED.